GRAY LINE BUS COMPANY *v.* GREATER BRIDGEPORT TRANSIT DISTRICT

PETERS, HEALEY, PARSKEY, ARMENTANO and SHEA, Js.

Argued June 10—decision released September 21, 1982

*James J. A. Daly,* with whom were *Thomas J. Weihing,* and, on the brief, *John L. Stawicki,* for the appellant (defendant).

*Samuel E. Friedman,* with whom was *Arthur Levy, Jr.,* for the appellee (plaintiff).

SHEA, J. The principal issue presented in this appeal is whether in an eminent domain proceeding the condemning authority must compensate a public utility company for the "going concern value" of the enterprise, including the franchise itself, where the rate of return from the whole system is insufficient to warrant the investment necessary to acquire the physical assets of the system, i.e., the land, buildings and equipment necessary for its operation.

The plaintiff appealed the assessment of $532,000 damages filed by the defendant in taking the property of the plaintiff by eminent domain. The case was tried before a state referee, *Hon. Michael J. Sicilian,* who rendered judgment finding the damages to be $1,272,182. The defendant has appealed from that award claiming error in the referee's valuation of two components thereof, the real estate and the intangibles. There is no dispute concerning the tangible personal property, consisting mainly of buses and related equipment, for which the parties stipulated a value of $319,182 before the referee. We find error only in the valuation of the intangibles and, accordingly, remand for further proceedings.

The plaintiff bus company was formed in 1922 when the public utilities commission ordered about twenty independent jitney owners who serviced a route from the General Electric plant in Bridgeport to Seaside Park to join forces and issued to the new company a certificate of convenience and necessity. Over the years additional routes were acquired until at the time of condemnation the company had eight routes which served Bridgeport, Fairfield, Stratford, and Trumbull. In 1926 the company acquired land on Dover Street, Bridgeport, on which it subsequently constructed a garage for buses. The garage was remodeled and an addition was constructed in 1944.

The plaintiff company has operated profitably throughout the period of its existence. During the three years before the condemnation its operations produced net earnings after taxes of approximately $50,000 per year.[1]

The referee's assessment of $1,272,182 damages for the taking was the sum of three items, for which separate values were given as follows: (1) real property, $425,000; (2) tangible personal property, $319,182, as agreed; and (3) franchises and other intangibles, $528,000.

## I

The value of $425,000 placed upon the real estate falls well within the broad range of trier discretion. See *E & F Realty Co.* v. *Commissioner of Transportation,* 173 Conn. 247, 253, 377 A.2d 302 (1977). One appraiser called by the plaintiff testified to a

---

[1] The defendant challenges this finding on the ground that no allowance was made in calculating net income for public funds paid to the plaintiff in the form of fare subsidies and leases of some buses at a nominal rent. Our analysis makes it unnecessary to consider this question.

total valuation of $461,500 for the land, garage building and site improvements. Its second appraiser gave a valuation of $491,700. The defendant's two appraisers arrived at values of $275,000 and $249,800 respectively. The only criticism which the defendant makes of the valuation of the real estate arrived at by the trier pertains to his conclusion that the unique suitability of the site for special use as a bus terminal increased the value of the property. The fair market value of a piece of real property should be determined in the light of the use to which it is being put or the use to which it could be put most advantageously. *Housing Authority* v. *Lustig*, 139 Conn. 73, 76, 90 A.2d 169 (1952). All parties agreed that the best use of the property on Dover Street was its present use as a bus garage. "[T]he fact that a given business is in operation on the property should be taken into consideration in determining the market value of the real property if in truth it is a factor in establishing that market value—if, that is, the use of the real property for that purpose enhances the value of it." Id., 76–77; see *Wronowski* v. *Redevelopment Agency*, 180 Conn. 579, 584–86, 430 A.2d 1284 (1980). There was evidence that the plaintiff's property was especially desirable for the operation of a bus terminal and that property of similar utility for this purpose would be very difficult to find in the Bridgeport area. We conclude that the referee did not err in considering this factor to enhance the value of the real estate in arriving at his valuation.

## II

The principal claim of error made by the defendant is directed against the allowance of $528,000 for the franchises and other intangibles included

in the taking. The trier did not assign separate values to the individual components of this valuation. The memorandum of decision does, however, discuss the evidence relating to the various elements which were taken into consideration in arriving at the total figure. Finding that the plaintiff company had consistently operated profitably and that it had earned about $50,000 per year in the three years prior to condemnation, the trier concluded that it had a "going concern value" in addition to the value of its physical assets. The memorandum refers to the franchises, the development of trained personnel, the layout of routes, and the establishment of schedules, fare structures, business systems, and industrial relations programs as factors entering into the valuation of the intangible assets. Expert witnesses for the plaintiff using different appraisal methods gave values ranging from $550,717 to $624,000 for the franchises and from $127,560 to $253,102 for the other intangibles. The defendant's expert witness testified that the earnings of the plaintiff company, which he calculated as $43,000 per year, would not warrant an investment of more than $300,000 for all its assets and, since the value of the real estate and equipment was far in excess of that amount, that no value could be attributed to the intangible assets of the company.

In the usual taking of business property no allowance is made for the value of the business above the physical assets because the owner can ordinarily continue the enterprise at another location. *Kimball Laundry Co.* v. *United States,* 338 U.S. 1, 11, 69 S. Ct. 1434, 93 L. Ed. 1765 (1948). See, e.g., *Bothwell* v. *United States,* 254 U.S. 231, 41 S. Ct. 74, 65 L. Ed. 238 (1920); 4 Nichols, Eminent Domain

(1981) § 13.3[1]. Problems which might be encountered in relocating a profitable business are presumed to affect the price which the fictional "willing" seller would demand for his real estate and ultimately its fair market value. *Brothers, Inc.* v. *Ansonia Redevelopment Agency,* 158 Conn. 37, 44, 255 A.2d 836 (1969); *Housing Authority* v. *Lustig,* supra, 78.

The condemnation of a public utility for the purpose of continued operation of the utility by a governmental agency entails some different considerations. Ordinarily nothing is left for the owner to take with him. Since most utilities are monopolies franchised to provide services in particular areas, it is not legally possible, even if it were otherwise feasible, for the former owner to start such an enterprise once again. *Kimball Laundry Co.* v. *United States,* supra, 13; see *Eljay Realty Co.* v. *Argraves,* 149 Conn. 203, 208, 177 A.2d 677 (1962). For these reasons it has been generally recognized that some amount must be paid by the condemnor above the value of the physical assets taken to represent the many advantages inherent in acquiring an operating business as compared to starting a new business with only land, buildings and equipment in place. *Omaha* v. *Omaha Water Co.,* 218 U.S. 180, 30 S. Ct. 615, 54 L. Ed. 991 (1910); *Norwich Gas & Electric Co.* v. *Norwich,* 76 Conn. 565, 577, 57 A. 746 (1904); 4 Nichols, Eminent Domain (1981) § 13.3. This intangible increment has been called "going concern value," a term which has sometimes been used broadly to encompass all those factors which contribute to the value of the enterprise apart from its physical assets. 2 Orgel, Valuation Under the Law of Eminent Domain (2d Ed. 1953) § 216.

## A

One of the components which has been separately identified is the franchise itself which represents the right to engage in the business, usually on an exclusive or semi-exclusive basis. A profitable franchise has been recognized as a property right entitled to constitutional protection. *Monongahela Navigation Co.* v. *United States,* 148 U.S. 312, 328–29, 13 S. Ct. 622, 37 L. Ed. 463 (1893) ; *State* v. *Suffield & Thompsonville Bridge Co.,* 81 Conn. 56, 62, 70 A. 55 (1908) ; *Enfield Tollbridge Co.* v. *Hartford & New Haven R. Co.,* 17 Conn. 454, 462 (1846). On the other hand, a public body in an eminent domain proceeding ought not to be required to pay more for property than would be raised in an ordinary sale between private parties. See *Searl* v. *School District No. 2,* 133 U.S. 553, 562, 10 S. Ct. 374, 33 L. Ed. 2d 740 (1890) ; 4 Nichols, Eminent Domain (1981) § 12.1. Where the evidence indicates that a public utility is doomed to operate at a loss or at a return not commensurate with the value of its physical assets, it is difficult to see why any allowance should be made for the right to operate the business which the franchise represents. 4A Nichols, supra, § 15.42[1] ; see *State* v. *Suffield & Thompsonville Bridge Co.,* 82 Conn. 460, 468, 74 A. 775 (1909). In such a case there can be little doubt about the verdict of the market place upon the value of such a right. "Substantial prices are not paid for the privilege of conducting a business at a loss." *Roberts* v. *New York City,* 295 U.S. 264, 282, 55 S. Ct. 689, 79 L. Ed. 1429 (1935).

It requires no extended analysis to ascertain that $50,000 of annual income upon a required outlay of $1,272,182, the value of the total enter-

prise as found by the referee, a return of 3.9 percent, is far below the income which such an investment would demand. The plaintiff virtually conceded as much during argument. We take judicial notice that interest rates have been in double digits for several years and that at the time of the condemnation they were more than three times the 3.9 percent which would be realized by a purchase of the plaintiff's assets at the prices fixed by the referee.[2] Although interest rates are not necessarily congruent with rates of return from equity investments, there are no circumstances found by the referee to suggest that any reasonable person would accept a return upon his investment in this enterprise so far below those prevailing.

The annual income of $50,000 which the plaintiff company has earned during the three years before the taking provided only a 6.7 percent return on the $744,182 valuation of its physical assets, i.e., the land, buildings and equipment. This rate is also far less than could have been realized from other available investments of equal or better quality.[3] This low return, however, does not indicate that the values placed upon those assets were excessive. The plaintiff's fare structure was subject to the law of diminishing returns and also to governmental regulation. As a public utility the plaintiff could earn no more than the regulatory agencies would allow as a reasonable return upon its established rate base, which would not normally include

[2] See generally U.S. Department of Commerce, Bureau of the Census, Statistical District of the United States, 277, 541, 544 (1980).

[3] See generally U.S. Department of Commerce, Bureau of the Census, Statistical District of the United States, 543 (rates of return on money market funds); 544 (returns on time and savings deposits held by Insured Commercial Banks); 545 (yields on stock, bonds and mortgage rates) (1980).

its physical assets at their present market value. In the highly inflationary environment of the past decade it is not surprising to find that the current value of the physical assets of a utility is far in excess of their value as constituents of the rate base and also greater than the value of the whole enterprise as measured by its earnings.

The plaintiff seeks a "going concern value" for its franchise but it must recognize that the award made for the physical assets at their present market value is substantially greater than their value for the production of income, which would be the principal concern of any private investor interested in continuing to operate the bus lines. In the *New Haven Inclusion Cases*, 399 U.S. 392, 481, 90 S. Ct. 2054, 26 L. Ed. 2d 691 (1970), a similar contention was rejected upon the ground that certain assets could not be valued as if the railroad were in liquidation and others as if it were still operating, thereby permitting the claimants "to have the best of both worlds." "It is not realistic to assume that a potential buyer would pay the liquidated value of the [railroad] assets and then pay additional amounts representing elements of going concern value in the face of the [railroad's] past deficit operations and its bleak prospects for the future." Id., 482.

The plaintiff relies upon two decisions of the New York Court of Appeals which have received mixed reviews by commentators to support its claim to compensation for the loss of its franchise. *In re Fifth Avenue Coach Lines*, 18 N.Y.2d 212, 219 N.E.2d 410 (1966), appeal dismissed, 386 U.S. 778, 87 S. Ct. 1480, 18 L. Ed. 2d 524 (1967), 22 N.Y.2d 613, 241 N.E.2d 717 (1968); *In re Port Authority Trans-Hudson Corporation (PATH)*, 20

N.Y.2d 457, 231 N.E.2d 734 (1967), cert. denied, 390 U.S. 1002, 88 S. Ct. 1244, 20 L. Ed. 2d 103 (1968). For comments on these cases see *New Haven Inclusion Cases,* supra, 482 n.80; *In the Matter of Valuation Proceedings Under Sections 303(c) and 306 of the Regional Rail Organization Act of 1973,* 445 F. Sup. 994, 1022 (1977); Aloi & Goldberg, "Condemnation of Transportation Facilities: New York's Recently Developed Public Utility Compensation Principles and Remaining Problem Areas," 55 Cornell L. Rev. 402 (1970). In *Fifth Avenue Coach Lines* the court found that, although the bus lines taken by eminent domain had been operating at a loss for many years, they were capable of profitable operation. Losses in the past were attributed to unreasonable and politically motivated rate regulation by the city of New York, the condemning authority. Apparently the court felt that the city could not be permitted to benefit from its wrongful conduct prior to the taking which had resulted in the losses which it relied upon for the contention that the franchises were worthless. In that respect *Fifth Avenue Coach Lines* is readily distinguishable from the present case, because this plaintiff has made no claim of unreasonable rate regulation.[4] Like many public transportation companies, the plaintiff has been a victim of the growth in automobile transportation. Its inability to generate earnings corresponding to the present value of its physical assets appears to be a product not of regulation but of social and economic forces beyond the practical control of any governmental agency.

---

[4] During oral argument upon inquiry by the court, the plaintiff's counsel did not dispute defense counsel's statement that all rate increases requested had been granted.

The situation presented in *PATH* was the condemnation of the "Hudson Tubes" which provided rail transportation to thousands of daily commuters through tunnels under the Hudson River between New York and New Jersey. The owner had not earned a profit on its investment in the facility for approximately thirty years, and for several years before the taking its receipts had been less than operating expenses. Like the case before us, *PATH* was a situation where economic and social factors, not governmental regulation, had caused revenues to diminish drastically. There was no prospect of any purchase of the tunnels by a private party. Indeed the tunnels had a negative value because of the cost of filling them up before they could be abandoned. Nevertheless, impressed by the fact that the condemning agency would otherwise acquire for nothing a facility having an estimated reproduction cost of $400,000,000 which it would continue to use in order to serve an important public need, the court allowed recovery of the depreciated cost of the investment in the tunnels and also approved making an award for "going concern value" despite the lack of profitability. The opinion does not expressly mention franchises, but does approve "the cost of organizing and systematizing the enterprise" as one of the elements to be considered.

The general rule is that the loss to the owner from the taking, and not its value to the condemnor, is the measure of the damages to be awarded in eminent domain proceedings. *Kimball Laundry Co.* v. *United States, supra,* 13; *Boston Chamber of Commerce* v. *Boston,* 217 U.S. 189, 30 S. Ct. 459, 54 L. Ed. 725 (1910). We would approve a deviation from that principle, as did the New York courts, in

a situation where its application produced an unfair result. The fundamental objective is to award "just compensation" and valuation standards must bend to this basic policy. We fail to perceive, however, any injustice in recognizing the economic reality that a franchise to operate a business at a loss is worthless, even though it once was an essential prerequisite to establishment of an enterprise which still retains sufficient social utility to justify its continued operation at substantial government expense. Public transportation is not the only business which has experienced losses from economic and social changes and we see no reason for special judicial treatment to rescue investments in that industry from hard times resulting from such forces.

Even if we were to follow the New York courts and adopt "benefit to the taker" in some form as the criterion in this case, we do not believe any award for the franchise was justified. The franchise in any economic sense was not only worthless to the plaintiff but it was also of no value to this defendant, whose statutory grant included authority to operate the bus lines. General Statutes § 7-273e (a). It was, of course, required to compensate the plaintiff for any damages resulting from the loss or impairment of the franchise, but that circumstance does not convert the franchise, which it necessarily acquired or obliterated by the taking, into a benefit.

We conclude that the absence of any findings to demonstrate that the franchise, which is simply the opportunity to operate the plaintiff's bus lines, had actual economic worth precluded any award for its taking.

## B

We perceive a substantial difference between the franchise and the other elements of the award for intangible property. Some of the remaining intangibles undoubtedly were of value to the defendant when it took over the operation of the bus lines. Because trained personnel were available and various business systems were in place the defendant was able to commence serving the public immediately. No expenses were incurred for training programs and the installation of necessary procedures. It is true that the plaintiff could never have enjoyed the present market value of its physical assets without effectively ceasing operations and liquidating them, events which would terminate the value to it of those intangibles related to the conduct of the business. See *New Haven Inclusion Cases,* supra, 482. Nonetheless, we are not convinced that no award should be made for those assets from which the defendant has benefited by virtue of the appropriation. "The condemnor of a failing utility may acquire assets which would be valueless in the private market but which are useful in continued operation of the utility by the government." *Milwaukee & Suburban Transport Corporation* v. *Milwaukee County,* 82 Wis. 2d 420, 443–44, 263 N.W.2d 503 (1978). Although benefit to the taker may not be the measure of damages in a condemnation proceeding, it is not wholly irrelevant in deciding whether the taking of a particular form of property merits some award. The basic principle that private property may not be taken without just compensation is offended where a pub-

lic authority is permitted to receive a windfall of substantial value without some recognition of the interest of the owners in the form of a reasonable award.

The criteria for making such an award present a more difficult problem. We would employ the standard scenario of hypothetical negotiations between a willing buyer and seller which is ordinarily used in determining fair market value. *Housing Authority* v. *Lustig,* supra, 76. It is not unheard of for an owner to be faced with a situation where his property, worthless to himself and to others who are not in a position to utilize it in some worthwhile fashion, has substantial value to only one person. *Olsson* v. *United States,* 25 F. Sup. 495, 87 Ct. Cl. 642 (1938) (patent for howitzer recoil mechanisms of value only to the government). Parcels of land which are landlocked or do not meet zoning requirements for a building permit are not uncommon. Virtually worthless to their owners, they often have substantial value to an adjoining landowner. Bargains are usually struck somewhere in the broad range between the increment of value to his other land from the acquisition visualized by the buyer and the amount of an offer which the seller for various reasons would regard as so unreasonable that he would keep his parcel in any event.

In the context of the case before us the upper limit of an award for the intangibles would be the reasonable cost of training the personnel and installing the various business systems which actually benefited the defendant when it took over the operation of the bus lines. *Milwaukee & Suburban Transport Corporation* v. *Milwaukee County,* supra, 444; see 2 Orgel, Valuation Under the Law of Eminent Domain (2d Ed. 1953) § 188, pp. 3-4. The

cost of such intangibles might well mark the point where an offer would not be rejected out of hand. "Figures appropriately related to original cost would be entirely 'just' to the transferors absent proof of a higher sale value . . . ." *In the Matter of Valuation Proceedings Under Sections 303(c) and 306 of the Regional Rail Organization Act of 1973,* 445 F. Sup. 994, 1030 (1977). "A figure based on original cost has the further advantage of relative ease of determination from records . . . ." Id., 1030.

It is impossible to determine from the valuation of $528,000 for all the intangible property what amount the referee attributed to the franchise, for which we have concluded there is no support for any award under the facts found in the memorandum of decision. We also cannot ascertain the amount of the allowance for the other intangibles or which of the elements claimed to have benefited the defendant entered into the calculation made by the referee. A new trial of the issues related to this part of the award is, therefore, necessary.

We find error only in the award made for the "franchises and other intangible assets." That part of the judgment is set aside and the case is remanded for further proceedings in accordance with this opinion.

In this opinion the other judges concurred.