[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Plaintiff, Orchard Properties, owned the property described on Schedule A attached to the "Appeal and Application For Review CT Page 2162 of Statement of Compensation" subject of this action, praying for a review of the statement of compensation.
An examination of plaintiff's exhibit K entitled "Aerial Photograph of Subject Properties" should be of assistance in understanding the facts involved that are undisputed. Connecticut Route 68 is a four lane limited access public highway with two lanes for traffic east bound and two lanes for traffic west bound. This highway is the predicate for the division into Barnes Park North and Barnes Park South. (See left top of exhibit K). Barnes Park South Road is a two lane highway for traffic proceeding south from Route 68 or for traffic from the south to Route 68. (Left side of exhibit K). Alexander Drive intersects Barnes Park South Road about 550 feet south of Route 68 and provides for two lanes of traffic in a generally south and east direction to a cul-de-sac and the subject taking of land from the property of plaintiff identified as "N/F Orchard Properties 14 Acres +." (See exhibits B, O, T. U, V — Lot 12). The area taken is bounded on the north by Cheshire Management Co., on the east by Thurston Properties, on the south by Orchard Properties and on the west by Alexander Drive and the cul-de-sac at the end of Alexander Drive. (See exhibits K, B. and U).
This parcel of land, identified as the Orchard Properties above, is a component of the Barnes Industrial Park of Wallingford. (See exhibit O). This industrial park consists of two areas of land. Each area has adequate access to Route 68 which in turn provides easy access to Interstate 91, Route 5, and Wilbur Cross Parkway, as well as local residential, commercial and industrial areas. The FIP Corporation of Cheshire developed the concept of a campus-like physical setting for offices, research and development, light industrial and flexible buildings in a controlled and restricted development. This concept, employed at the Farmington (Conn.) Industrial Park, has been extended to the Barnes Industrial Park. A major restriction is that no building or structure can cover more than twenty percent of the land area of any given development lot or area. Control is reserved by the developers of the park in that all construction and development of physical improvements must be conducted by the developer. All real estate services are under the control of the developer. The FIP Corporation controls design, development and construction. These activities result in profit.
This factor of expected profit from physical activities of the developer is a factor for consideration in land valuation.
Exhibit O presents eight photos of existing structures on land in the park, an aerial view of the available transportation facilities, and a blueprint-like sketch of existing structures. CT Page 2163
There can be no question but that this campus-like setting and easy access to Route 68 and to Interstate 91 is attractive to any type of commerce either office, research and development, industrial or warehousing. The developers desire to maintain the park accordingly and to maintain control to protect that high standard of campus-like appearance.
The basic undisputed facts support the following conclusions. "Thurston Foods, Inc." then of 914 North Colony Road, Wallingford was desirous of expanding its physical plant and secured an option from the owners of the land abutting the above identified land owned by Cheshire Management Co. See exhibit B now identified as Thurston Properties 26.2 + ac. The letter "T" in a green circle identifies this area as the Stegos property. The letter "S" in a green circle identifies a portion of the Thurston Properties as originally owned by the State of Connecticut. This area was zoned residential. There was no access to this 26.2+ acres to or from Route 68 (north). There was no access to Alexander Drive (west). There was no access to any then existing road to the south.
As a result of a suggestion from Mr. Thurston at a public meeting or hearing while Town authorities were in the process of rezoning the Town the Stegos (now Thurston) property was zoned "IX" (industrial expansion). The land abutting and to the east of the now Thurston Properties remained residential and provided the only alternative access through a residential area.
Thurston absolutely required access to a public highway for delivery trucks including large trailer tractors to meet its business demands. A "curb cut" into the east bound lanes of Route 68 (over land then owned by the State) was impossible and unrealistic. An examination of exhibit B and the Vitali land to the south eliminates the feasibility of using that property for access to the Thurston Properties. The third alternative would be to provide access to the east through the residential area. This theory or suggestion was never explored in good faith. Rather it was advanced as an after the fact escape hatch from the "paint yourself into a corner situation" the parties now rest in.
Thurston, of course, directed its attention to the west of fourth alternative means of gaining access to a public highway. The north, south and east points on the compass provided no feasible or practical access.
A representative of Thurston approached an Orchard Properties representative expressing an offer to buy land for access to the Stegos property before exercising its option.
It was refused. Orchard was not interested in a sale of any CT Page 2164 of its property.
The Mayor of Wallingford was unable to bring the parties together as a willing seller and a willing buyer. Condemnation proceedings followed by the Town for the benefit of Thurston. Thurston exercised its option and purchased the Stegos property. Thurston also obtained the land abutting Route 68 from the State of Connecticut.
This action results from the statement of compensation filed in this court as a result of the taking of part of Orchard's land.
There are two basic facts that are undisputed: (1) the taking was on March 31, 1988, (2) Orchard Properties was not a willing seller.
This court must decide two basic issues: (1) the highest and best use on March 31, 1988 of the land taken, (2) just compensation based on the highest and best use on March 31, 1988 of the land taken.
1.
It is concluded that the highest and best use or most advantageous use on March 31, 1988 of the land taken was for access to and from Alexander Drive to the Thurston Properties now consisting of 26.2 acres +. It must again be noted that this present acreage includes land received from the State of Connecticut abutting on the south side of Route 68 and land purchased under Thurston's option from Stegos. (exhibit B)
 "the `highest and best use' concept . . . has to do with the use which will most likely produce the highest market value, greatest financial return, or the most profit from the use of a particular piece of real estate." State National Bank v. P Z Commission, 156 Conn. 99, 101 (1968); Mobile Oil Corp. v Westport, 182 Conn. 554, 560 (1980)
Prior to March 31, 1988 and on July 27, 1990 the day this referee viewed the entire Barnes Industrial Park and neighborhood, the Orchard Properties was unimproved and consisted of 14+ acres of raw land. The taking consists of approximately .74 acre that carries a right of way from the cul-de-sac at the end of Alexander Drive to the Thurston Properties. This land or right of way is now devoted to a paved two lane road that accommodates large trailer tractors and refrigerated delivery trucks to and from the 26.2 acres+ now known as Thurston Properties. This condemned land is the sole and only means of entry and egress for vehicular CT Page 2165 traffic to Thurston's Properties and buildings. Its food distribution business is founded on and needs vehicular transportation for its very existence.
The circumstances of this condemnation that did in fact happen via the acts of the Town of Wallingford for the benefit of Thurston clearly support the conclusion that no other alternative was practical or feasible as a means of access for Thurston's Properties and its food distribution business.
The physical evidence and opinions of plaintiff's experts clearly support the conclusion that the most advantageous use of the land is for access to the Thurston-Properties.
The land has been devoted to access. That devotion and use has enhanced its value to Thurston. Plaintiff seeks to have this referee recognize that some amount must be paid by the condemnor (Thurston Properties) above the before and after value of the Orchard Properties 14 acres + to represent the many advantages inherent in acquiring this otherwise not readily or easily attainable access to its 26.2+ acres of land. It is also, plaintiff's claim that the increment in value of all Thurston Properties is a significant factor contributing to "benefits taken" in which plaintiff should share.
This referee agrees.
 "On the other hand, a public body in an eminent domain proceeding ought not to be required to pay more for property than would be raised in an ordinary sale between private properties." Gray Lines p. 423.
The second issue for decision by this referee is to decide the amount of just compensation based on the decision that the highest and best use of the land was its present devotion as access to the Thurston Properties.
 "The general rule is that the loss to the owner from the taking, and not its value to the condemnor, is the measure of the damages to be awarded in eminent domain proceedings." Gray Line Bus Co. v. Greater Bridgeport Transit
District, 188 Conn. 417, 427 (1982).
In that case our Supreme Court indicated they would approve a deviation from that principle where its application produced an "unfair result." CT Page 2166
 "The fundamental objective is to award `just compensation' and valuation standards must bend to this basic policy." Gray Line at 248.
It is plaintiff's position that this "benefit to the taker," criterion should be adopted in this case. The evidence clearly indicates that this access to the Thurston Properties enhanced the actual economic worth and value of the entire Thurston Properties, including the land abutting Route 68 formerly owned by the State of Connecticut and the land southeast of Thurston's property identified as "14 acres+ N/F Vitali." (Exhibit K)
The record i.e. testimony, physical evidence and opinions of plaintiff's expert witnesses support a finding that the access gained enhanced the actual economic worth and value of the above defined land area into a substantial benefit to Thurston.
 "Although benefit to the taker may not be the measure of damages in a condonation proceeding, it is not wholly irrelevant in deciding whether the taking of a particular form of property merits some award. The basic principle that private property may not be taken without just compensation is offended where a public authority is permitted to receive a windfall of substantial value without some recognition of the interest of the owners in the form of a reasonable award."
 "The criteria for making such an award present a more difficult problem. We would employ the standard scenario of hypothetical negotiations between a willing buyer and seller which is ordinarily used in determining fair market value."
Gray Line p. 430
 "Generally speaking, market. value is `the price what would in all probability — the probability being based upon the evidence in the case — result from fair negotiations, where the seller is willing to sell and the buyer desired to buy,' Portland Silk Co. v. Middletown, 125 Conn. 172, 174, 4 A.2d 422. From this it follows that in determining market values in awarding damages for land taken, it is proper to consider all those elements which an owner or a prospective purchaser could reasonably urge as affecting CT Page 2167 the fair price of the land; . . . unless, indeed, the considerations advanced are not a necessary, natural or proximate result of the taking. . . . The determination of the damages to be paid requires the consideration of `everything by which the value is legitimately affected'; Holley v. Torrington, 63 Conn. 426, 433, 18 A. 613; . . ." The fair market value of a piece of real property should be determined in light of the use to which it is being put or the use to which it could be put most advantageously. Housing Authority v. Lustig, 139 Conn. 73, 76
(1952)
The taken land is used in its highest and best use to the advantage of the entire Thurston Properties as a means of access to and from public highway. This access is a prime condition that legitimately affects the value of the taken land.
It is a fact that plaintiff's land was taken by way of condemnation by the Town for the benefit of Thurston. This taking resulted in legal access that facilitated ingress and egress to and from the the heretofore "no access to a public road or highway" Thurston Properties. This benefited Thurston in that it obtained full, complete, and unrestricted access necessary for the full and complete development of its property for its highest and best use i.e. as an office and warehouse for its food storage and distribution business. This benefit to Thurston Properties was a foreseeable, natural and proximate result of the taking. The Town and Thurston Properties certainly proceeded into this condemnation with their "eyes open." Their "escape hatch" after the fact suggestion of cutting a road easterly to the residential area avoids the reality of the history involved.
The land was taken. The condemnor (real party in interest) benefited. The condemnee is entitled to share in the benefits.
This is not the usual "before and after rule" of damages type of case.
The benefits to be awarded in this type of case must be founded on the price that the trier reasonably thinks would result from fair negotiations between a willing seller and a willing buyer, contemplating the highest and best possible use of the land, giving a prudent investor the greatest financial return. In making such a determination the trier must select the method of valuation most appropriate to the facts of this case.
"When, as here, the trier has visited the CT Page 2168 property to be appraised, he may rely on his visual observations to supplement the evidence presented for his consideration by the witnesses under oath."
 . . . "In condemnation proceedings, the trial court is more than a trier of facts or an arbiter of differing opinions of witnesses; it is charged with the duty of making an independent determination of value and fair compensation in light of all the circumstances, the evidence, its general knowledge and its — viewing of the premises." D'Addario v. Commissioner of Transportation, 180 Conn. 335, 336 (1980).
On May 8, 1985 Thurston Enterprises, Inc. by its president entered into an Option Agreement with Stanley W. Stegos and Marie S. Stegos to purchase approximately 15-20 acres, being all of the land of Stegos (then) bearing the zoning classification "IX" bounded "Northerly: by land of the State of Connecticut (Rte. 68)." "Said premises being without access, express or implied, to -any public highway." (See plaintiff's exhibit C). The price to be paid was $20,000.00 per acre. It was acknowledged and affirmed "that the premises which are the subject of this Option Agreement have no access to a public highway and that none is to be conveyed as part of this agreement."
This signed agreement supports a finding and conclusion that the market value of the Stegos acreage without access, express or implied, to any public highway was $20,000.00 an acre.
There is no doubt that the Town of Wallingford condemned the land taken for the benefit of Thurston. There is no doubt that Thurston is responsible for the condemnation costs and damages resulting from the condemnation per the signed letter in evidence.
The issue of just compensation for the taking of the access land must employ the standard scenario of hypothetical negotiations between a willing buyer and seller which is ordinarily used in determining fair market value in condemnation cases.
 "Bargains are usually struck somewhere in the broad range between -the increment of value to his other land from the acquisition visualized by the buyer and the amount of an offer which the seller for various reasons would regard as so unreasonable that he would keep his parcel in any event." Gray Line p. 430. CT Page 2169
Evidence presented before this referee indicated that comparable sales of industrial property in a nearby area carried c per acre price of $175,000.00 and $160,000.00. Less desirable property sold for industrial purposes for $110,000.00 and $107,542.00 per acre. Opinion evidence from appraisers valued the Thurston Properties after the taking as having a fair market value between $100,000.00 per acre and $180,000.00 per acre.
Defendant in its Trial Brief of August 17, 1990, page 69 lists $144,000.00 per acre as just compensation for the taking.
This referee accepts that figure as the fair market value of an acre of land on March 31, 1988 after gaining access to public highways from the Thurston Properties.
 Value per acre 3/31/88 $144,000.00 Cost per acre without access 20,000.00 Enchancement per acre after access $124,000.00
Hypothetical negotiations between a willing buyer (Thurston) and seller (whose private land was condemned) should result in an even division of this enhanced value of $124,000.00 per acre as damages.
The Thurston Properties include a brook, a ravine and some wetlands. These factors impact on this referee's concern to avoid "a windfall of substantial value" to Thurston Properties and also to avoid any appearance of a "hold up" by Orchard Properties.
One-half of the enhancement, is $62,000.00 per acre. Reducing the acreage of 26.2 to 20 acres considered enhanced supports a finding and conclusion that plaintiff is entitled to an award of $1,240,000.00 from Thurston or one-half the benefits derived from the taking of plaintiff's land.
The statement of compensation is for $108,000.00. The above award to plaintiff of $1,240,000.00 less said sum of $108,000.00 equals $1,132,000.00 Judgment may enter for the sum of One Million One Hundred Thirty-Two Thousand Dollars ($1,132,000.00) plus interest from the date of the taking, March 31, 1988 to the date of payment in order to satisfy the deficiency in compensation justly due to plaintiff.
Plaintiff's counsel will prepare a suitable judgment form that recites the reasonable fees awarded to the appraisers on the record, the proposed calculation of interest and thereafter submit it to the Clerk of this court for his approval as to form and content and for signature of the undersigned. CT Page 2170
John N. Reynolds State Trial Referee