[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is an appeal from the amount of compensation offered by the plaintiff, the Urban Redevelopment Commission of the city of Stamford (URC), to the defendants, Barry Chavkin and Joyce Chavkin. The plaintiff exercised its power of eminent domain as authorized by General Statutes § 8-128 to obtain property owned by the defendants at 439-441 Atlantic Street in downtown Stamford as part of the plan to relocate the Swiss Bank to Stamford. The site was 3,299 square feet in size and contained a four-story masonry building with a total gross building area of 5,706 square feet.
There was a retail tenant on the first floor, Cousin's Clothing, also owned and operated by the defendants, and sixteen unfurnished residential apartments on the second, third and fourth floors. It was agreed by the plaintiff and the defendants that the then existing use, mixed retail and residential, represented the highest and best use for the zone, CC-N (Central City-North), in which the property was located.
Pursuant to General Statutes § 8-129, the plaintiff, URC, filed with the clerk of this court on June 5, 1995, a notice of condemnation and a statement of compensation for the property in the amount of $305,000, which sum was deposited with the clerk on that date. A certificate of taking was filed on August 8, 1995. The defendants appealed from this award pursuant to General Statutes § 8-132, which authorizes an appeal by one who claims to be aggrieved by an inadequate award of compensation. Thus, the issue in this case is whether the defendants are entitled to additional compensation over and above the compensation already offered by the plaintiff, URC. CT Page 5753
Each party presented a licensed appraiser and member of the Institute of Appraisers (MIA) as an expert witness. Both appraisers filed their written appraisals as exhibits. The appraiser for the plaintiff, URC, James J. Moran, testified that in his opinion the subject property was worth $325,000,[1] the amount that URC had offered to the defendants. The defendants' appraiser, Michael B. Gold, testified that the property was worth $440,000 as of the date of taking.
The court's role is to determine "just compensation" for the "persons entitled thereto." General Statutes § 8-128. "The amount that constitutes just compensation is the market value of the condemned property when put to its highest and best use at the time of the taking. In determining market value, it is proper to consider all those elements which an owner or a prospective purchaser could reasonably urge as affecting the fair price of the land. The fair market value is the price that a willing buyer would pay a willing seller based on the highest and best possible use of the land assuming, of course, that a market exists for such optimum use." (Citations omitted; internal quotation marks omitted.) Robinson v. Westport, 222 Conn. 402, 405, 610 A.2d 611 (1992).
"The general rule is that the loss to the owner from the taking, and not its value to the condemnor, is the measure of the damages to be awarded in eminent domain proceedings." Gray Line Bus Co. v. GreaterBridgeport Transit District, 188 Conn. 417, 427, 449 A.2d 1036. In an eminent domain proceeding, "a trial court may seek aid in the testimony of experts, but must ultimately make its own independent determination of fair compensation . . . on the basis of all the circumstances bearing upon value." (Citations omitted; internal quotation marks omitted.) Frenchv. Clinton, 215 Conn. 197, 202-203, 575 A.2d 686 (1990).
The appraisers for each party employed both a comparable sales or market data approach and also the income capitalization analysis. The problem is that using the same two approaches to valuation, the two appraisers are $115,000 apart.
In support of the claim by the defendants that the amount of compensation offered by the plaintiff was inadequate, Mr. Gold utilized the comparable sales approach and testified that he used six sales between 1992 and 1995 to arrive at a figure of approximately $120 per square foot for the retail use and $60 per square foot for the residential or apartment use. This equates to $77.51 per square foot, and a total of $440,000 for the subject premises.
Mr. Moran, the plaintiff's expert witness, also employed the comparable sales approach and referred to four mixed-use sales in 1995. He arrived at an adjusted figure of $42.28 per square foot for the sale of 97-99 CT Page 5754 Atlantic Street, the other mixed-use property on the same street. After making several adjustments, he ultimately valued the subject premises at $260,000.
Using the income capitalization approach, the parties agreed that the total or gross income for the subject premises was approximately $100,000 a year, and that expenses amounted to approximately $30,000 a year. The disparity between the two reports involves the vacancy rate and the loss for non-payment of rent.
In support of the defendants' appeal, Mr. Gold testified that a vacancy/collection loss of 10% should be applied to the retail space and 15% for the apartments, or approximately $13,400. Net operating income per year therefore became $55,918. Using a capitalization rate of 13%, Mr. Gold valued the defendants' property as $430,000.
Mr. Moran also employed the income approach and used a rate of 22.5% for vacancy and collection loss for the sixteen apartments and 15% for the retail use. He determined therefore that approximately $20,000 should be subtracted for this purpose, resulting in net operating income of approximately $48,654, a difference of over $7,000 between his figures and those of Mr. Gold. Using a capitalization rate of 14%, he reported that the value of the premises was $325,000, the amount offered by the plaintiff
With the reports of the two appraisers at such variance, the court determined to make an independent determination of value and fair compensation. A good starting point is to note that the building in question was purchased by the defendants in 1983 from Mr. Chavkin's parent for $290,000. The second point is that the city of Stamford tax assessor valued the property as of $371,000 for purposes of real estate taxation on the grand list of October 1, 1995.[2]
First, as to comparable sales, a good indicator of value would have been the sale at 97-99 Atlantic Street in July of 1993, because the building is located on the same street in close proximity to the subject premises, is about the same size and also had a mixed-use of retail and residential. This property sold for $245,000. Mr. Gold claims that the owners then spent $200,000 for renovations, which represents a sale at $77.11 per square feet, which would translate into a value of $440,000 for the subject premises.
Mr. Moran referred to an application for a building permit at 97-99 Atlantic Street in the amount of $75,000, for a total cost of $320,000. This would equate to $42.28 per square foot, and including his other comparables as adjusted, a fair market value of $260,000 for the subject CT Page 5755 premises.
The actual figure for renovations at 97-99 Atlantic Street was never presented with sufficient clarity for this court to venture an opinion on the value of the subject premises as contrasted with the only sale that was truly a comparable. Because of the lack of reliable data about the cost of renovating the comparable at 97-99 Atlantic Street, the court will turn to the income approach, noting, however, in passing, that the plaintiff's figure of $260,000 is less than the defendants paid for the subject premises in 1983, twelve years earlier, and also less than the city of Stamford's determination of fair market value for real estate tax purposes of $371,000 as of October 1, 1993.
The issue in the income approach is the disparity between the two estimates of net operating expenses, which in turn arose from a significant difference in the estimated vacancy/collection loss rate. The most reasonable vacancy/collection rate, however, is the one advocated by the defendants' appraiser because Mr. Chavkin testified plausibly that he did not have any vacancy in his rooms, and had no trouble collecting from his rooming house tenants.[3] Furthermore, on February 14, 1995, Mr. Chavkin signed an agreement with Swiss Bank, pursuant to which the bank would pay Mr. Chavkin the rent for each apartment as it became vacant. Moreover, he did not have a vacancy on the first floor or collection loss because he owned the retail store on that floor as his own tenant in effect, although it was conceded that Mr. Chavkin's store had some financial problems preventing payment of the actual rent called for in the lease.
Employing the plaintiff's estimates of gross income and total expenses of $30,465, both of which seemed reasonable, but subtracting Mr. Gold's figure of $13,451 for vacancy/collection loss, results in net operating income of $55,405. Using the plaintiff's cap rate of 14%,[4] the value of the subject premises would then be $395,000.[5]
In conclusion, after reviewing the testimony of the witnesses, the appraisal reports, the other exhibits, the excellent and comprehensive briefs of the parties, and using the vacancy/credit loss urged by the defendants in the amount of $13,451, the court is of the opinion that the fair market value of the subject premises was, at the time of taking by the plaintiff, $395,000. Because this amount is more than the amount offered by the URC, the appeal by the defendants is sustained pursuant to General Statutes § 8-132. Thus, judgment enters for the defendants to be awarded additional compensation of $90,000.[6]
The defendants are also entitled to interest on that sum pursuant to General Statutes § 37-3c in the amount of 10% per year "from the date CT Page 5756 of taking to the date of payment," as that rate is deemed reasonable. This statute also provides that interest should not run "on any funds deposited by the condemnor as compensation for the taking for the period after such deposit funds become available for withdrawal by the condemnee." Thus, interest is calculated on $90,000 from August 8, 1995 to the date of this judgment, which amounts to $51,550. Therefore, the total due the defendants at this time is $141,550.
Court costs are to be taxed pursuant to General Statutes § 8-133.
So Ordered.
Dated at Stamford, Connecticut, this 1st day of May, 2001.
William B. Lewis, Judge T.R.