[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is an appeal from an award of compensation offered to the plaintiff, Thomas Stavros, by the defendant, the Urban Redevelopment Commission of the city of Stamford (URC). The defendant exercised its power of eminent domain as authorized by General Statutes § 8-128[1]
to obtain property owned by the plaintiff at 475 Atlantic Street in downtown Stamford as part of the plan to relocate the Swiss Bank to Stamford.
The site was variously described as containing somewhere between 13,000 and 14,000 square feet. A three-story, 12,238 square foot brick building constructed in 1926, and a number of parking spaces were located on the property. There were four retail tenants on the first or ground floor, and twelve one or two bedroom unfurnished residential apartments on the second and third floors. The building also contained billboards, which were described as "a large dual facing billboard" on the roof of the building, 62 feet long and 12 feet wide, and four smaller billboards, 12 by 25 feet, attached to the walls.
On June 5, 1995, pursuant to General Statutes § 8-129,[2] the defendant, URC, filed with the clerk of this court a notice of condemnation and a statement of compensation for the property in the amount of $900,000. The plaintiff, who first acquired an interest in the property in 1944, appeals from this award pursuant to General Statutes § 8-132,[3] which authorizes an appeal by one who claims to be aggrieved by an inadequate award of compensation. Thus, the issue in this case is whether the plaintiff is entitled to additional money over and above the compensation offered by the URC.
Each party presented a licensed appraiser and member of the Institute of Appraisers (MIA) as an expert witness. The appraiser for the plaintiff, Mark D. Stephens, a vice president of CB Commercial Real Estate Group, Inc., testified that the property was worth $1,420,000 as of the CT Page 5996 date of taking. The appraiser for the defendant URC, Gerald v. Rasmussen, a vice president of Moran Associates, testified that in his opinion the subject property was worth $900,000, the amount that the URO had offered to the plaintiff.
"We begin our analysis of this claim by setting forth the general, well established principles that govern the taking of real property by eminent domain. The fifth amendment to the United States constitution, as applied to the states through the due process clause of the fourteenth amendment . . . provides that `private property [shall not] be taken for public use, without just compensation.' U.S. Const., amend. V. Article first, § 11, of the Connecticut constitution similarly provides that "[t]he property of no person shall be taken for public use, without just compensation therefor.'" (Citations omitted; internal quotation marks omitted.) Northeast Ct. Economic Alliance v. ATC Partnership,256 Conn. 813, 827-28, 776 A.2d 1068 (2001).
This court's role is to determine "just compensation" for the owner.Robinson v. Westport, 222 Conn. 402, 405, 610 A.2d 611 (1992). "The amount that constitutes just compensation is the market value of the condemned property when put to its highest and best use at the time of the taking . . . In determining market value, it is proper to consider all those elements which an owner or a prospective purchaser could reasonably urge as affecting the fair price of the land. The fair market value is the price that a willing buyer would pay a willing seller based on the highest and best possible use of the land assuming, of course, that a market exists for such optimum use." (Citations omitted; internal quotation marks omitted.) Id.
"The general rule is that the loss to the owner from the taking, and not its value to the condemnor, is the measure of the damages to be awarded in eminent domain proceedings." Gray Line Bus Co. v. GreaterBridgeport Transit District, 188 Conn. 417, 427, 449 A.2d 1036. In an eminent domain proceeding, "a trial court may seek aid in the testimony of experts, but must ultimately make its own independent determination of fair compensation . . . on the basis of all the circumstances bearing upon value." (Citations omitted; internal quotation marks omitted.) French v.Clinton, 215 Conn. 197, 202-203, 575 A.2d 686 (1990).
The plaintiff and the defendant agreed that the existing uses, mixed retail and residential, represented the highest and best use for the zone, CC-N (Central City-North), in which the property was located. The appraisers for each party employed both a comparable sales or market data approach and also an income capitalization analysis. In support of the claim by the plaintiff that the amount of compensation offered by the defendant was inadequate, Mr. Stephens prepared a "consultation CT Page 5997 analysis," not a formal appraisal report.[4] The plaintiff's appraiser utilized the comparable sales approach and testified that he analyzed a number of sales between September, 1992 and November, 1994, to arrive at a sales price of approximately $90 per square foot of gross building area for the retail use and $35,000 per apartment unit for a total of $420,000 for the residential use. This equates to $1,216,100 for the subject premises after adding a sum for the advertising billboards located on the roof and walls of the subject building which produced, according to the plaintiff, $48,000 of annual income in 1995.
Mr. Rasmussen, the defendant's expert witness, also employed the comparable sales approach and referred to three mixed-use sales in 1993, plus one listing. He arrived at an adjusted figure of $48 per square foot for these sales which were in the vicinity of the subject premises. After making several adjustments for factors such as location, and a weakened market from 1989 to 1993, the witness ultimately valued the subject premises at $825,000 based on comparable sales. Mr. Rasmussen valued the billboards at $273,000, on the basis of $36,000 of income per year, as contrasted with the plaintiff's appraisal of $410,000.
Using the direct income capitalization approach, the plaintiff's appraiser calculated that the total or gross income for the subject premises was $232,800[5] a year, and that expenses, for such items as taxes, insurance and management fees, amounted to $51,179 a year. Mr. Stephens also testified that he applied a vacancy/collection loss rate of 10% to the retail space and 5% for the apartments and billboards, plus a 1% collection loss, for a total of $18,108. Net operating income per year therefore became $163,513. Using a capitalization rate of 11.5%, Mr. Stephens valued the plaintiff's property at $1,420,000.
Mr. Rasmussen also employed the income approach and indicated that annual gross income at the time of the taking was $81,300 for the retail uses, $102,000 for the apartments and $36,000 for the billboards, a total annual gross income of $219,300 a year. He used a rate of 16% for vacancy and collection loss for the twelve apartments, 15% for the retail use and 5% for the billboards, a total of $30,315. The defendant's appraiser also determined that the operating expenses, including real estate taxes, repairs, and management fees, were $65,534 a year, resulting in net operating income of $123,451, a difference of about $40,000 between his figures and those of Mr. Stephens. Using a direct capitalization rate of 12.75% for the retail and residential uses, and 12.5% for the billboard rental income, the defendant's appraiser reported that the value of the premises was $970,000. With a figure of $875,000 based on comparables, and $970,000 based on his income approach, the appraiser determined that the fair market value of the subject premises was $900,000, the amount originally offered to the plaintiff, and a figure that actually gives a CT Page 5998 little more weight to the comparable sales approach.
With the reports of the two appraisers at such variance, an independent determination of value and fair compensation is indicated. Certainly, a starting point is to note that the city of Stamford's tax assessor valued the fair market value of the property as $1,021,570 for purposes of real estate taxation on the grand list of October 1, 1993.[6] Also of note is that the plaintiff, as owner, insured the subject premises in 1995 for $1,155,000.
First, as to comparable sales, the plaintiff's appraiser stated that this approach was not as accurate an indicator of fair market value as the income approach because of the difficulty of finding comparable properties, as the subject property was somewhat unique in terms of location, age, condition, and other variables, and this court agrees. Therefore, fair market value will be based on the income approach.
The issue in that approach is the disparity between the two estimates of gross income, the operating expenses and the estimated vacancy/collection loss rate. The most reasonable estimates for these items are from the plaintiff's appraiser because the plaintiff's property manager testified plausibly about increased rents he was receiving during the year of taking from the four retail stores and for use of the billboards.[7] In addition, the property manager testified that he did not have any vacancies in the retail stores or in the apartments, which were always rented quickly if one became free and without the need of brokers. He also testified that he had no credit losses at least until it became known that the URC would be taking the property in order that the Swiss Bank could relocate in the area. Thus, the lower vacancy/credit figure used by the plaintiff seems more realistic under the circumstances.
Employing the plaintiff's estimates of gross income of $232,800, and total expenses of $51,179, a vacancy and credit loss of $18,108, results in a net operating income of $163,513. Using the defendant's cap rate of 12.75%,[8] the fair market value of the subject premises would then be $1,282,455. Because this amount is more than the amount offered by the URC, the appeal by the plaintiff is sustained pursuant to General Statutes § 8-132. Thus, judgment enters for the plaintiff in the amount of $1,282,455.
The plaintiff is also entitled to interest on that sum "from the date of taking to the date of payment." Fishman v. Urban RedevelopmentCommission of Stamford, 175 Conn. 265, 268, 397 A.2d 1349 (1978). General Statutes § 37-3c provides for interest in the amount of 10% per year and that rate is deemed reasonable. It is assumed that the parties can CT Page 5999 calculate interest themselves, but if it becomes an issue, the parties should contact the case flow office to arrange a hearing for that purpose.
Court costs are to be taxed pursuant to General Statutes § 8-133, including an appraisal fee of $2,500, which is deemed to be reasonable.
So Ordered.
Dated at Stamford, Connecticut, this 10th day of May, 2002.
William B. Lewis, Judge Trial Referee.