## NORTHEAST CT. ECONOMIC ALLIANCE, INC., ET AL. *v.* ATC PARTNERSHIP ET AL.
### (SC 16245)
### (SC 16246)

McDonald, C. J., and Borden, Katz, Palmer and Flynn, Js.*

Argued November 2, 2000—officially released July 24, 2001

* Although Chief Justice McDonald reached the mandatory age of retirement before the date that this opinion was officially released, his continued participation on this panel is authorized by General Statutes § 51-198 (c). The listing of justices reflects their seniority status on this court as of the date of oral argument.

*Richard S. Cody*, with whom were *Ana C. Navarro* and *Lisa Silvestri*, for the appellant-appellee in each case (plaintiffs).

*Richard P. Weinstein*, with whom was *Nathan A. Schatz*, for the appellee-appellant in both cases (named defendant).

*Edward P. McCreery III*, *Charles K. Campbell* and *Matthew P. Lundy* filed a brief for the Stamford Urban Redevelopment Corporation et al. as amici curiae.

*Opinion*

BORDEN, J. The principal issue in these consolidated appeals and this cross appeal is whether, in the underlying condemnation proceeding, the trial court improperly excluded, as a matter of law, evidence and testimony regarding the environmental contamination and remediation costs associated with the condemned property. The plaintiffs, the Northeast Ct. Economic Alliance, Inc. (Northeast), and the town of Windham (town),[1] appeal[2] from the judgment of the trial court, which reassessed the award of damages for the taking by eminent domain of the real property of the named defendant, ATC Partnership.[3] In their appeal, the plaintiffs claim that the trial court, in its valuation of the taken property, improperly excluded, as a matter of law, evidence of environmental contamination and remediation costs.[4] In its cross appeal, the defendant

[1] Although the record reveals inconsistencies as to whether the town was acting in the capacity of a plaintiff or a defendant in the proceedings below, for the sake of clarity, references throughout this opinion to the plaintiffs are to Northeast and the town.

[2] The plaintiffs appealed and the named defendant cross appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeals to this court pursuant to Practice Book § 65-2 and General Statutes § 51-199 (c). We subsequently granted the motion of the named defendant to consolidate the appeals.

[3] Other defendants named in this action, who failed to file appearances, are the city of Willimantic, the state of Connecticut, American Thread Company, Walter C. Goettlich, Laura C. Goettlich, Keith J. Nasin, Mark E. Nasin, Southern New England Telephone Company, Summit Hydropower, Willimantic Power Corporation, Eastern Connecticut Industrial Park Associates, Lloyd's Bank PlC, Farmington Valley Construction, Inc., Tobacco Valley Sanitation Service Company, Willimantic Lumber and Coal Company, Willimantic Hydro Company, Inc., and Baybank Boston NA. The remaining defendants, Connecticut Light and Power Company, the Daiwa Bank, Ltd., and Michael Rosenberg, as assignee of Daiwa Bank, are not involved in this appeal. Therefore, references herein to the defendant are to the named defendant only.

[4] The plaintiffs also claim that the trial court improperly: (1) excluded evidence of the actual conditions of the property and the reasonable costs of rehabilitation associated therewith; (2) limited the plaintiffs' ability to cross-examine the appraisers on their assumptions that the property was

claims that the trial court improperly denied its request for an evidentiary hearing regarding the appropriate rate of interest to be allowed on the amount of compensation awarded, granting instead interest only at the default statutory rate pursuant to General Statutes § 37-3c.[5] We conclude that evidence of environmental con-

clean; (3) excluded evidence that the defendant received, by using evidence in the economic development plan and the consulting reports prepared by or on behalf of the plaintiffs, a forgiveness of more than $1.5 million in debt from Daiwa Bank, the first mortgagee; (4) failed to conduct a hearing in order to determine the admissibility, under *State* v. *Porter*, 241 Conn. 57, 698 A.2d 739 (1997), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998), of the expert opinion testimony by the real estate appraisers relating to the market value of commercial property, and by not stating on the record its reasons for admitting the testimony of the court-appointed expert; and (5) failed to open the judgment in order to determine the town's offset for owed real property taxes, interest on the taxes, costs and fees. With respect to the first three of these claims, the defendant contends that they are not entitled to appellate review. In view of our conclusion, however, that a new trial is required at which evidence of environmental contamination and remediation costs will be admissible, we need not address either the reviewability or the merits of any of these claims. With respect to the fourth claim, namely, the requirement of a *Porter* hearing as a precondition to the admissibility of the expert appraisal testimony, and particularly with respect to the conclusion of the concurring and dissenting opinion of Judge Flynn that such a hearing is required for the admissibility of evidence of remediation costs and environmental issues, we similarly express no opinion. In sum, we leave *all* five of these claims—and any others that may arise—to the new trial that we order herein.

[5] General Statutes § 37-3c provides: "The judgment of compensation for a taking of property by eminent domain shall include interest at a rate that is reasonable and just on the amount of the compensation awarded. If a court does not set a rate of interest on the amount of compensation awarded, the interest shall be calculated as follows: (1) If the period for which interest is owed does not exceed one year, interest shall be calculated from the date of taking at an annual rate equal to the coupon issue yield equivalent, as determined by the Secretary of the Treasury of the United States, of the average accepted auction price for the last auction of fifty-two-week United States treasury bills settled immediately prior to the date of taking; and (2) if the period for which interest is owed exceeds one year, interest for the first year shall be calculated pursuant to the provisions of subdivision (1) of this section and interest for each additional year shall be calculated on the combined amount of principal, which is the amount by which the compensation award exceeds the original condemnation deposit, plus accrued interest at an annual rate equal to the coupon yield equivalent, as

tamination and remediation costs may not be excluded, as a matter of law, from a condemnation proceeding. Accordingly, we reverse the judgment of the trial court.

The trial court found the following facts. The defendant was the owner of a parcel of real property in the town, occupying approximately forty acres. The parcel previously was owned by the American Thread Company (American Thread), which used the complex until 1985 as a textile mill in the manufacture of thread, yarn and string products. In 1985, American Thread ceased its manufacturing operations and sold the parcel to Eastern Connecticut Industrial Park Associates (Eastern). Prior to that conveyance, a release of hazardous waste had occurred at the complex, and the transferor, American Thread, filed a so-called "Form III" pursuant to the Connecticut Transfer Act; General Statutes §§ 22a-134 through 22a-134d; in which it certified that it would remediate the hazardous waste discharge as required by, and subject to the approval of, the department of environmental protection. In 1987, Eastern sold the parcel to the defendant for $2.7 million. During the time that the defendant owned the complex, no manufacturing activity took place there.

For several years prior to the taking in 1994, the plaintiffs and the defendant had been actively involved in a nonadversarial effort to obtain governmental funding for the rehabilitation and redevelopment of the property pursuant to the Economic Development and Manufacturing Assistance Act of 1990; General Statutes

determined by the Secretary of the Treasury of the United States, of the average accepted auction price for the last auction of fifty-two-week United States treasury bills settled immediately prior to the beginning of each year for which interest is owed. Such judgment shall not include interest on any funds deposited by the condemnor as compensation for the taking for the period after such deposited funds become available for withdrawal by the condemnee. The interest shall accrue from the date of taking to the date of payment."

In view of our conclusion that a new trial is required, we need not address the issue on the cross appeal.

§§ 32-220 through 32-234. In December, 1993, this effort culminated in the publication and submission to the department of economic and community development of a lengthy, comprehensive economic development plan entitled "Windham Mills and Windham State Heritage Park Master Action Plan." Prior to the taking in 1994, the plaintiffs possessed detailed information about the environmental condition of the complex based upon the assessments made by two environmental consulting firms in October, 1993, and June, 1994, whose reports were a matter of public record, and were available to all of the parties involved well before the negotiations between them for the voluntary acquisition of the property had broken down.

The trial court found the following additional facts that relate specifically to the condition of the complex at the time of the condemnation by Northeast in 1994. The trial court found that the condition of the buildings on the complex "ranged in general from poor to good [and that the] extent of damages caused by leaks was [in some instances] quite extensive, involving multiple structural components over large areas . . . ." (Internal quotation marks omitted.) In addition, one of the buildings, commonly referred to as Mill 4, showed "advanced signs of deterioration, including collapsing walls, leaking roofs, buckling floors and vegetation and trees in the interior of the building protruding through the roof . . . ." (Internal quotation marks omitted.) In its determination of just compensation, and consistent with its ruling on the defendant's motion in limine, however, the trial court did not take into account evidence of the environmental contamination and remediation costs related to the property.

In August, 1994, Northeast, acting on behalf of the town,[6] filed a statement of compensation in the amount

---

[6] Pursuant to General Statutes § 32-224, the town adopted a resolution authorizing Northeast to act as the town's implementing agency to condemn and take certain real property within the town.

of \$1 in connection with the taking of the complex. In September, 1994, Northeast filed a return of notice and deposited \$1 with the clerk of the Superior Court pursuant to General Statutes § 8-130.[7] Thereafter, the defendant applied, pursuant to General Statutes (Rev. to 1993) § 8-132,[8] for review of the statement of compensation.

[7] General Statutes § 8-130 provides: "Whenever any redevelopment agency files a statement of compensation as provided for in section 8-129, it shall deposit with the clerk of the Superior Court a sum of money equal to the amount set forth in the statement of compensation to the use of the persons entitled thereto. The redevelopment agency, at any time prior to the issuance by the clerk of the Superior Court of a certificate of taking, as provided for in section 8-129, may withdraw any condemnation proceeding by filing with the clerk of the Superior Court a withdrawal, which shall state that all persons having a record interest therein have been given notice of the withdrawal in the same manner as provided in section 8-129 for giving notice of the filing of a statement of compensation. Upon the filing of such a withdrawal the clerk of the Superior Court shall return to the redevelopment agency any moneys deposited in court without charge of any fee. The redevelopment agency shall cause a copy of such withdrawal to be recorded in the office of the town clerk of each town in which the property which is the subject of the condemnation proceeding is located so as to remove the lis pendens as provided in section 8-129. If the amount of compensation is finally determined through the filing of an amended statement of compensation which is thereafter accepted by the owners and all other persons having a record interest therein as provided for in section 8-131, the redevelopment agency shall deposit with such amended statement an additional sum of money representing the excess over the amount appearing in the original statement of compensation. Interest shall not be allowed in any judgment on so much of the amount as has been deposited in court. Upon the application of any person claiming an interest therein the Superior Court, or any judge thereof, after determining the equity of the applicant in the deposit, shall order that the money so deposited or any part thereof be paid forthwith for or on account of the just compensation to be awarded in the proceeding. If the compensation finally awarded exceeds the total amount of money so deposited or received by any person or persons entitled thereto, the court shall enter judgment against the municipality for the amount of the deficiency."

[8] General Statutes (Rev. to 1993) § 8-132 provides: "Appeal by owner. Any person claiming to be aggrieved by the statement of compensation filed by the redevelopment agency may, at any time within six months after the same has been filed, apply to the superior court for the judicial district in which such property is situated, or, if said court is not in session, to any

After the taking, the town, as the transferee, executed a Form III certification, which stated that the defendant, as the transferor, was " 'unable to submit a negative declaration [because the] property was taken by eminent domain, involuntarily.' " In November, 1994, the town transferred the property by quitclaim deed to Windham Mills Development Corporation (Windham Mills), a private nongovernmental corporation. The Form III certification by Windham Mills stated that a negative declaration could not be provided by the town because it had " 'acquired the property by eminent domain as part of [a] regional redevelopment plan supported by the State of Connecticut [and that a] site investigation is currently being performed.' " After it acquired the property, Windham Mills demolished sev-

judge thereof, for a review of such statement of compensation so far as the same affects such applicant, and said court or such judge, after causing notice of the pendency of such application to be given to said redevelopment agency, shall appoint a state referee to make a review of the statement of compensation. Such referee, having given at least ten days' notice to the parties interested of the time and place of hearing, shall hear the applicant and said redevelopment agency, shall view the property and take such testimony as such referee deems material and shall thereupon revise such statement of compensation in such manner as he deems proper and forthwith report to the court. Such report shall contain a detailed statement of findings by the referee, sufficient to enable the court to determine the considerations upon which the referee based his conclusions. Such report may be rejected for any irregular or improper conduct in the performance of the duties of such referee. If the report is rejected, the court or judge shall appoint another referee to make such review and report. If the report is accepted, such statement of compensation shall be conclusive upon such owner and the redevelopment agency. If no appeal to the appellate court is filed within the time allowed by law, or if one is filed and the proceedings have terminated in a final judgment finding the amount due the property owner, the clerk shall send a certified copy of the statement of compensation and of the judgment to the redevelopment agency, which shall, upon receipt thereof, pay such property owner the amount due him as compensation. The pendency of any such application for review shall not prevent or delay whatever action is proposed with regard to such property by the project area redevelopment plan."

The legislature subsequently amended § 8-132. See Public Acts 2000, No. 00-89, which is set forth in footnote 10 of this opinion.

eral of the buildings in the complex, and thereafter engaged in the management of various substances, including asbestos, lead and polychlorinated biphenyls (PCBs), as well as petroleum contamination, which had been identified and reported by the environmental consulting firms that had been retained by the plaintiffs.

It is undisputed that there was environmental contamination on the property on the date of the taking. Prior to the commencement of trial, however, the defendant filed a motion in limine to preclude the introduction of evidence and testimony regarding environmental contamination or remediation costs related to the complex. The town subsequently made an evidentiary offer of proof, which Northeast adopted, with respect to the evidence that the plaintiffs intended to offer regarding the condition of the property at the time of the taking. The offer stated that the plaintiffs would put on evidence of "[t]he presence of asbestos containing material (ACM) and the conditions of these materials. This offer [would] include evidence that: (1) there were approximately 35,000 linear feet of ACM mostly in the form of pipe and duct insulation used in the construction of the buildings and other improvements, the condition of which was in extremely bad shape, eroding and decomposing, and had dropped and was dropping into . . . piles on the floors, throughout the interior of the buildings, especially basements; (2) the ACM was friable, airborne and in a state whereby it would become airborne by disturbances including walking and air movement; (3) the ACM had to be abated, contained or removed according to applicable health and other codes before the buildings (i) could be used or occupied; (ii) could be rehabilitated; (iii) could be demolished; and (4) the abating, containing, removing and disposing of the ACM represents costs in rehabilitating the structures, and the estimates of the said abatement, were it

done according to the applicable codes, known at the time of the taking."

The offer also stated that the plaintiffs would introduce evidence of the "[p]resence of lead-containing materials, like lead paint, and the conditions of those materials." The offer would "include evidence that: (1) throughout the buildings there were tens of thousands of square feet of wall, ceiling and floor space that had lead-based and/or lead-containing paint that crumbled, peeled and otherwise deteriorate[d], in many places having dropped into piles of dust and peelings on the floors and along the walls; (2) these materials had decomposed, in open, accessible areas, and in a state whereby they would become airborne by disturbances including walking and air movement; (3) these materials had to be abated, contained, removed or disposed according to applicable health and other codes before the buildings (i) could be used or occupied; (ii) could be rehabilitated; (iii) could be demolished; and (4) the abating, containing, removing and disposing of these materials represents costs in rehabilitating the structures, and the estimates of the said abatement, were it done according to the applicable codes, known at the time of the taking."

The offer of proof further stated that the plaintiffs would introduce evidence of "[s]oil [c]ontamination by PCBs and by petroleum substances. This offer will include evidence that: (1) PCBs were both in equipment at the facility and in the soils in different areas of the property as the consequence of leaking transformers, that required special disposal of the equipment and soil excavation, backfilling, transportation and disposal at an approved landfill, and testing, according to applicable statutes, regulations, codes and guidelines . . . (2) [p]etroleum contamination existed, coming from various former on-site sources, and that the conditions required soil excavation, backfilling, transportation and

disposal at an approved landfill, and testing, according to applicable statutes, regulations, codes and guidelines . . . [and] (3) the abating, containing, removing and disposing of these materials represents costs in rehabilitating the structures and in using the grounds, and the estimates of the said abatement, were it done according to the applicable codes, known at the time of the taking." Finally, the offer stated that the plaintiffs would introduce evidence of "[t]he potential and/or actual groundwater contamination. This offer will include evidence that conditions in the soil, along with historical practices of the former textile manufacturer, required drilling and monitoring groundwater for certain substances, according to applicable statutes, regulations, codes and guidelines, and that the abating, containing, removing and disposing of these materials represents costs in rehabilitating the structures and in using the grounds, and the estimates of the said abatement, were it done according to the applicable codes, known at the time of the taking."

The trial court made a preliminary ruling on the defendant's motion in limine. This ruling was that: (1) evidence of cost estimates for the remediation of the environmental contamination, which admittedly existed at the time of the taking, would be excluded from the so-called first phase of the condemnation hearing; (2) the parties would proceed to present their evidence, including the testimony of their appraisers, other witnesses, and documentary evidence, subject to the evidentiary exclusion; and (3) the trial court would then make a definitive ruling after reviewing the factual record and the legal claims made by the parties on the question of whether the plaintiffs' offer of proof as to the environmental remediation costs should be permitted under the circumstances of the case.

The parties proceeded to present their evidence, beginning in November, 1997. Utilizing the comparable

sales approach, Dean C. Amadon, the real estate appraiser called by Northeast, testified that the value of the property was $850,000 "free and clear of environmental hazards . . . ." He concluded, however, that "the market value of the fee-simple estate of the subject property . . . has no value [because the] cost to cure the environmental hazards is in excess of our opinion of the value of the premises as though free and clear of environmental hazards . . . ." F. Jerome Silverstein, the valuation expert called by the defendant, relied on the income approach and testified that the fair market value of the property was $4,500,000, exclusive of environmental concerns and remediation costs. After the parties had presented their evidence, including the testimony of their appraisers and other witnesses, as well as documentary evidence subject to the evidentiary exclusion, the trial court rendered a final ruling granting the defendant's motion in limine to preclude the introduction of evidence and testimony regarding environmental contamination or remediation costs related to the subject property.

Thereafter, because of the divergent valuations presented by Amadon and Silverstein, the court appointed Peter R. Marsele as its own valuation expert witness to determine, subject to the evidentiary exclusion, the fair market value of the property. Marsele testified that he rejected the income approach employed by Silverstein because any estimates of the costs of renovations and improvements associated with putting the property in a rentable condition would be "very speculative . . . ." Instead, Marsele utilized the comparable sales approach, determined the highest and best use of the property to be a combination of light industrial, office and commercial use, and estimated the fair market value of the complex to be $1,675,000.[9]

---

[9] We note that Amadon, Silverstein and Marsele each took into account the Master Plan described previously in their determinations as to the fair market value of the property. Although Amadon and Marsele were precluded from testifying as to what effect environmental contamination and remedia-

The trial court subsequently concluded, upon weighing the opinions of the appraisers and the parties' claims, that the only appropriate method of valuation under the circumstances of the present case was the comparable sales approach employed by Amadon and Marsele. The court further concluded that Marsele's valuation analysis was the more accurate and credible appraisal. Accordingly, the trial court reassessed the damages and rendered judgment awarding the defendant $1,675,000 as just compensation for the taking of its property. The trial court subsequently denied the town's motion to open the judgment. The trial court also denied the defendant's motion to present evidence as to the rate of interest to be included in the judgment of compensation. These consolidated appeals and this cross appeal followed.

During the pendency of these appeals and this cross appeal, the legislature amended General Statutes (Rev. to 1999) § 8-132 to require: (1) the report of the referee to "take into account any evidence relevant to the fair market value of the property, including evidence of environmental condition and required environmental remediation"; and (2) the referee to "make a separate finding for remediation costs and the property owner shall be entitled to a setoff of such costs in any pending or subsequent action to recover remediation costs for the property." Public Acts 2000, No. 00-89 (P.A. 00-89).[10]

tion costs had on the fair market value of the property, Amadon, Silverstein and Marsele each testified that their appraisals included consideration of the noncontaminated, physical disrepair of the property.

[10] Public Acts 2000, No. 00-89, entitled "An Act Concerning Fair Market Value Of Brownfields," provides: "Any person claiming to be aggrieved by the statement of compensation filed by the redevelopment agency may, at any time within six months after the same has been filed, apply to the superior court for the judicial district in which such property is situated, or, if said court is not in session, to any judge thereof, for a review of such statement of compensation so far as the same affects such applicant, and said court or such judge, after causing notice of the pendency of such application to be given to said redevelopment agency, shall appoint a state referee to make a review of the statement of compensation. Such referee,

Consequently, preceding oral argument before this court and pursuant to a motion filed by the town, we ordered the parties to file supplemental briefs on the effect of P.A. 00-89 on the present appeals. Because we conclude, however, that, under traditional constitutional principles of just compensation, evidence of environmental contamination and remediation costs may not be excluded, as a matter of law, from a condemnation proceeding, we need not consider whether P.A. 00-89 was intended to apply retroactively.

Before reaching the plaintiffs' dispositive claim on appeal, we briefly address the applicable standard of review. "The scope of our appellate review depends upon the proper characterization of the rulings made by the trial court. To the extent that the trial court has made findings of fact, our review is limited to deciding

having given at least ten days' notice to the parties interested of the time and place of hearing, shall hear the applicant and said redevelopment agency, shall view the property and take such testimony as such referee deems material and shall thereupon revise such statement of compensation in such manner as he deems proper and forthwith report to the court. Such report shall contain a detailed statement of findings by the referee, sufficient to enable the court to determine the considerations upon which the referee based his conclusions. The report of the referee shall take into account any evidence relevant to the fair market value of the property, including evidence of environmental condition and required environmental remediation. The referee shall make a separate finding for remediation costs and the property owner shall be entitled to a setoff of such costs in any pending or subsequent action to recover remediation costs for the property. Such report may be rejected for any irregular or improper conduct in the performance of the duties of such referee. If the report is rejected, the court or judge shall appoint another referee to make such review and report. If the report is accepted, such statement of compensation shall be conclusive upon such owner and the redevelopment agency. If no appeal to the Appellate Court is filed within the time allowed by law, or if one is filed and the proceedings have terminated in a final judgment finding the amount due the property owner, the clerk shall send a certified copy of the statement of compensation and of the judgment to the redevelopment agency, which shall, upon receipt thereof, pay such property owner the amount due him as compensation. The pendency of any such application for review shall not prevent or delay whatever action is proposed with regard to such property by the project area redevelopment plan."

whether such findings were clearly erroneous. When, however, the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record. . . . *Torres* v. *Waterbury*, 249 Conn. 110, 118–19, 733 A.2d 817 (1999)." (Internal quotation marks omitted.) *Olson* v. *Accessory Controls & Equipment Corp.*, 254 Conn. 145, 156, 757 A.2d 14 (2000). None of the parties has challenged the factual findings of the trial court. Our task, therefore, is to decide whether, based on those factual findings, the trial court's conclusions of law are legally and logically correct.

Because it is dispositive of these appeals, we first consider the plaintiffs' claim that the trial court improperly excluded, as a matter of law, evidence of environmental contamination and remediation costs related to the taken property. Specifically, the plaintiffs and the amici argue that, by excluding such evidence, the trial court improperly applied the usual standard established for calculating just compensation, namely, fair market value. The defendant counters that the admissibility of such evidence fails to recognize the mutually independent nature of the law of eminent domain and environmental law, and compromises their different purposes and attendant rights and defenses. We agree with the plaintiffs.

We begin our analysis of this claim by setting forth the general, well established principles that govern the taking of real property by eminent domain. The fifth amendment to the United States constitution, as applied to the states through the due process clause of the fourteenth amendment; *Webb's Fabulous Pharmacies, Inc.* v. *Beckwith*, 449 U.S. 155, 160, 101 S. Ct. 446, 66 L. Ed. 2d 358 (1980); provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const., amend. V. Article first, § 11, of the

Connecticut constitution similarly provides that "[t]he property of no person shall be taken for public use, without just compensation therefor." This constitutional principle is well reflected throughout the General Statutes and our case law. See, e.g., *Minicucci* v. *Commissioner of Transportation*, 211 Conn. 382, 384, 559 A.2d 216 (1989) ("[t]he owner of land taken by condemnation is entitled to be paid just compensation" [internal quotation marks omitted]). "[T]he question of what is just compensation is an equitable one rather than a strictly legal or technical one. The paramount law intends that the condemnee shall be put in as good condition pecuniarily by just compensation as he would have been in had the property not been taken. *Colaluca* v. *Ives*, [150 Conn. 521, 530, 191 A.2d 340 (1963)]." (Internal quotation marks omitted.) *Alemany* v. *Commissioner of Transportation*, 215 Conn. 437, 444, 576 A.2d 503 (1990); see also *Commissioner of Transportation* v. *Towpath Associates*, 255 Conn. 529, 540, 767 A.2d 1169 (2001).

We have stated repeatedly that "[t]he amount that constitutes just compensation is the market value of the condemned property when put to its highest and best use at the time of the taking. *Minicucci* v. *Commissioner of Transportation*, [supra, 211 Conn. 384]; *Cappiello* v. *Commissioner of Transportation*, 203 Conn. 675, 681, 525 A.2d 1348 (1987); *Budney* v. *Ives*, 156 Conn. 83, 88, 239 A.2d 482 (1968). In determining market value, it is proper to consider all those elements which an owner or a prospective purchaser could reasonably urge as affecting the fair price of the land . . . . *Budney* v. *Ives*, [supra, 88]. *Greene* v. *Burns*, 221 Conn. 736, 745, 607 A.2d 402 (1992). The fair market value is the price that a willing buyer would pay a willing seller based on the highest and best possible use of the land assuming, of course, that a market exists for such optimum use. *Mazzola* v. *Commissioner*, 175 Conn. 576,

581–82, 402 A.2d 786 (1978). *Minicucci* v. *Commissioner of Transportation,* supra, 384. The highest and best use concept, chiefly employed as a starting point in estimating the value of real estate by appraisers, has to do with the use which will most likely produce the highest market value, greatest financial return, or the most profit from the use of a particular piece of real estate. *State National Bank* v. *Planning & Zoning Commission,* 156 Conn. 99, 101, 239 A.2d 528 (1968)." (Internal quotation marks omitted.) *Robinson* v. *Westport,* 222 Conn. 402, 405–406, 610 A.2d 611 (1992). " 'In determining its highest and best use, the trial referee must consider whether there was a reasonable probability' " that the subject property would be put to that use in the reasonably near future, and what effect such a prospective use may have had on the property's market value at the time of the taking. Id., 406; see also *Greene* v. *Burns,* supra, 748 ("[t]he questions of the highest and best use of property and of the reasonable probability of a [future change affecting value] . . . are questions of fact for the trier").

"[B]ecause each parcel of real property is in some ways unique, trial courts must be afforded substantial discretion in choosing the most appropriate method of determining the value of a taken property. *D'Addario* v. *Commissioner of Transportation,* 180 Conn. 355, 365, 429 A.2d 890 (1980); *Slavitt* v. *Ives,* 163 Conn. 198, 209, 303 A.2d 13 (1972); *Moss* v. *New Haven Redevelopment Agency,* 146 Conn. 421, 425–26, 151 A.2d 693 (1959)." *French* v. *Clinton,* 215 Conn. 197, 200–201, 575 A.2d 686 (1990). "In condemnation hearings, the state referee sitting as a court [of] appeals . . . is more than just a trier of fact or an arbitrator of differing opinions of witnesses. He is charged by the General Statutes and the decisions of this court with the duty of making an independent determination of value and fair compensation in the light of all the circumstances, the evidence,

his general knowledge and his viewing of the premises. *Birnbaum* v. *Ives*, 163 Conn. 12, 21, 301 A.2d 262 (1972); see also *Minicucci* v. *Commissioner of Transportation*, [supra, 211 Conn. 388]."[11] (Internal quotation marks omitted.) *Eichman* v. *J & J Building Co.*, 216 Conn. 443, 453, 582 A.2d 182 (1990).

In considering this issue of first impression in our state,[12] we recognize that there is a split of authority as to the admissibility of evidence of environmental contamination and remediation costs. We note that a majority of the jurisdictions that have considered the issue have concluded that such evidence is admissible. 7A P. Nichols, Eminent Domain (3d Ed. Rev. 2000, P. Rohan & M. Reskin eds.) § 13B.03 [3] [a], p. 13B-94. We perceive two approaches that have emerged from the analyses of those courts that favor inclusion of evidence of environmental contamination and remediation costs.

The first line of reasoning—the broader of the approaches—reaches the general conclusion that, as a factor affecting the fair market value of the property, evidence of environmental contamination and remediation costs is admissible. See *Redevelopment Agency* v. *Thrifty Oil Co.*, 4 Cal. App. 4th 469, 474 n.9, 5 Cal. Rptr. 2d 687 (1992) ("[a]s a characteristic of the property

---

[11] Although General Statutes (Rev. to 1993) § 8-132 requires the referee to view the condemned property, in the present case, the parties filed written waivers, which stated that, because of the extensive rehabilitative changes that had occurred since the taking, the complex was in a substantially different state than at the time of the taking and a visit to the site would not be of any probative value in the court's determination of just compensation.

[12] The plaintiffs contend that this is not a case of first impression. They rely on our decisions in *White Oak Excavators, Inc.* v. *Burns*, 172 Conn. 478, 374 A.2d 1097 (1977), and *Stradmore Development Corp.* v. *Commissioner of Transportation*, 173 Conn. 112, 376 A.2d 1095 (1977), for the proposition that the trial court should have considered remediation costs in its valuation of the condemned property. Such reliance is misplaced. Although not inconsistent with our conclusion herein, those decisions did not expressly address the principal issue before us in the present case and cannot be read as broadly as the plaintiffs suggest.

which would affect its value, the remediation issue was properly before the trier of fact"); *Olathe* v. *Stott*, 253 Kan. 687, 689–90, 861 P.2d 1287 (1993) (Kansas Storage Tank Act does not preempt General Statutes regarding eminent domain; thus, contamination evidence, which "necessarily affects the market value of real property," is admissible in eminent domain proceedings, purpose of which is "to determine the fair market value of the property taken"); *State* v. *Brandon*, 898 S.W.2d 224, 225 (Tenn. App. 1994) ("evidence of . . . contamination and the cost of remedying it were relevant in determining the fair market value of the property in question").

The second line of reasoning—the narrower approach—permits the admissibility of contamination evidence if there is a "sufficient factual predicate upon which to conclude that the contamination" affected market value. *Finkelstein* v. *Dept. of Transportation*, 656 So. 2d 921, 922 (Fla. 1995). In *Finkelstein*, the Florida department of transportation condemned a parcel of property owned by the petitioners in that appeal. Prior to the taking, one of the petitioners discovered petroleum groundwater contamination and reported the contamination to the Florida department of environmental regulation (department), which determined that the property was eligible under a state program that ensured reimbursement of the remediation costs incurred by the property owners. Id., 923. At the time of the taking, the property was in the process of being cleaned. Id., 925. Prior to the valuation trial, the department filed a motion in limine seeking to put into evidence that, at the time of the taking, the property was contaminated with petroleum hydrocarbon. Id., 923. The department contended that its proffered evidence would have established: (1) the fact of the contamination on the date of valuation and the extent of the contamination; (2) the amount of the remediation costs; (3) that "[b]uyers, sellers, and lending institutions rou-

tinely request contamination assessments of real property"; (4) that lending institutions are reluctant to finance contaminated property or obtain such property in default; and (5) that "[i]ncreased costs related to procurement of contamination assessments, restrictions on use, and the 'stigma of contamination' affect the marketability and desirability of the property and would have a negative impact on the value of the subject property of at least twenty to twenty-five percent." Id. The trial court denied the department's motion in limine and its proffered evidence, concluding that, because the remediation costs were being reimbursed, the fact of contamination was not relevant. Id. On appeal, the Florida Supreme Court held that "evidence of contamination is relevant and admissible on the issue of market value in a valuation trial if there is a sufficient factual predicate upon which to conclude that the contamination does affect the market value of the property taken." Id., 922. On the basis of that general framework, the court first concluded that, under the circumstances of that case, namely, where the property was being cleaned at the time of the taking and there was a program in place to reimburse the owners for the remediation costs; id., 924; evidence of remediation costs was not relevant to the valuation of the property because, the court reasoned, "the property should be valued as if the cleaning of the property had been successfully completed at the time of the taking." Id., 925. With respect to whether evidence of contamination stigma was admissible for the purpose of showing the effect, if any, on the fair market value of the property, however, the court remanded the case to the trial court for a determination as to whether an "adequate factual predicate" had been established to permit the admissibility of such evidence. Id.

In view of our jurisprudence governing the valuation of real property taken by eminent domain and the well

reasoned authority from other jurisdictions favoring the inclusion of contamination and remediation evidence, we join those courts that have adopted the first approach just described, and hold that evidence of environmental contamination and remediation costs is relevant to the valuation of real property taken by eminent domain and admissible in a condemnation proceeding to show the effect, if any, that those factors had on the fair market value of the property on the date of the taking.[13] We therefore conclude that it was an abuse of discretion for the trial court to have excluded such evidence as a matter of law.

As stated previously, just compensation is ordinarily calculated by determining the fair market value of the property on the date of the taking. Excluding contamination evidence, as a matter of law, is likely to result in a fictional property value—a result that is inconsistent with the principles by which just compensation is calculated. It blinks at reality to say that a willing buyer would simply ignore the fact of contamination, and its attendant economic consequences, including specifi-

[13] We disagree with two of the critical, related conclusions drawn in *Finkelstein*, namely, that: (1) because the property was in the process of being cleaned as of the date of the taking and the remediation costs were going to be reimbursed by a state program, the property should be valued as though it were "clean" on the date of the taking; and (2) evidence of the remediation costs related to the condemned property was therefore inadmissible. *Finkelstein* v. *Dept. of Transportation*, supra, 656 So. 2d 923–24. Those conclusions in *Finkelstein* ignore some of the factors that a willing buyer likely would take into account in considering how much to pay for a property such as the property taken in *Finkelstein*, including: the time period over which the cleanup would occur; the time period over which the reimbursement would take place; any potential litigation over the cleanup; and the delay, caused by the cleanup, in having a fully usable parcel of property. Thus, simply because remediation has begun and will eventually be reimbursable, does not preclude the likelihood that a willing purchaser would take these related factors into account in deciding how much to pay for the property. Thus, we reject the approach of *Finkelstein*, and, instead, leave to the trier of fact the weight to be accorded the evidence of contamination and remediation costs.

cally the cost of remediation, in deciding how much to pay for property. Contamination may affect the market value of property in a number of other ways. For example, the following factors, in addition to the actual costs of remediation, may make a particular parcel less attractive to potential purchasers: (1) potential liability under various environmental statutory schemes; (2) potential litigation brought by members of the public for damages relating to the contaminants; (3) stigma to the property even after full remediation; (4) higher financing costs charged by lending institutions by virtue of the contamination; and (5) increased regulation. 7A P. Nichols, supra, § 13B.04 [1] [a], pp. 13B-103 through 13B-107. That diminished attractiveness would likely affect the price that a willing buyer would pay for the property.

The following hypothetical situation illustrates one way in which excluding evidence of environmental contamination and remediation costs may result in a fictional fair market value of the condemned property: Assume two nearly identical parcels of property, A and B. Parcel A, which has no environmental contamination, has a market value of $5 million. Parcel B has contamination and there is credible evidence that, in order to remediate the contamination on the property, it would cost $2 million. If considered to be a "clean" property, parcel B is valued at $5 million. Under the defendant's argument, the owners of parcels A and B would each receive $5 million as just compensation if the parcels were condemned. Yet, it is a fiction that in an open market, a willing buyer on the date of the taking, with all of the information just set forth, would pay $5 million for the contaminated property when he or she could pay $5 million for a nearly identical parcel with no contamination. Put another way, it is likely that, in negotiating with the seller of parcel B, the purchaser would insist on some discount from the $5 million value in order to reflect the contamination. To adopt the

defendant's rationale would violate the well established principle that the property owner or condemnee receive what he or she would have received in an open market.

That is not to say that the admissibility of the costs of remediation should necessarily result in, or should necessarily preclude, a dollar-for-dollar reduction in the market value of the property. Nor is such evidence determinative. The issue before us is the *admissibility* of such evidence. Just as the cost of repair of physical damage may bear on the fair market value of property in other legal contexts; see, e.g., *Willow Springs Condominium Assn., Inc.* v. *Seventh BRT Development Corp.*, 245 Conn. 1, 60 n.53, 717 A.2d 77 (1998) (tort and breach of contract); *Peterson* v. *Oxford*, 189 Conn. 740, 750, 459 A.2d 100 (1983) (nuisance); the cost of remediation of contamination may bear on the fair market value of property in the condemnation context. It bears emphasis that, in calculating just compensation in a valuation trial, "a trial court may seek aid in the testimony of experts, but must ultimately make its own independent determination of fair compensation . . . on the basis of all the circumstances bearing upon value." (Citation omitted; internal quotation marks omitted.) *French* v. *Clinton*, supra, 215 Conn. 202–203. "Every element which enters into the market value of property should be *admissible* in evidence when relevant and material . . . ." (Emphasis added.) *Campbell* v. *New Haven*, 101 Conn. 173, 184, 125 A. 650 (1924). The *weight*, however, to be attributed to evidence of environmental contamination and remediation costs is to be determined by the trial court as the trier of fact.

In the present case, the trial court, in an interlocutory ruling, granted the defendant's motion in limine to preclude the introduction of evidence of environmental contamination and remediation costs, and ruled that the parties would proceed to put on their evidence, subject to the evidentiary exclusion, and that, upon the

completion of that first phase, it would make a final determination with respect to the defendant's motion. Amadon testified that, assuming the subject property was "clean," the fair market value of the property was $850,000. He testified, however, that he did not believe that that figure represented the actual fair market value of the property on the date of the taking, but was precluded from testifying as to what he believed the actual fair market value of the property to be. After the parties presented their evidence, the trial court made its final determination and granted the defendant's motion in limine, thereby excluding, as a matter of law, evidence of environmental contamination and remediation costs.[14] Subsequently, Marsele, who was appointed by the court as an expert appraiser after the trial court had granted the defendant's motion in limine, was expressly ordered by the court not to take into consideration evidence of environmental contamination and remediation costs. Although in an eminent domain proceeding, the trial court is given substantial discretion in determining what constitutes just compensation, it was an abuse of discretion to exclude, as a matter of law, such evidence.

The defendant argues, to the contrary, that the leading treatise on eminent domain; see 7A P. Nichols, supra, § 13B; and, specifically, the analysis in chapter 13B thereof, supports the exclusion of contamination evidence in an eminent domain proceeding. As a preliminary matter, we note that the most recent release of chapter 13B of the Nichols treatise, dated March, 2000, does not endorse either the admissibility or the inadmissibility of evidence of environmental contamination and

---

[14] The trial court stated that, even if it were to adopt the *Finkelstein* approach, the plaintiffs did not satisfy the factual predicate required by such an approach. Because we conclude that even the *Finkelstein* approach is too restrictive; see footnote 13 of this opinion; we need not address the propriety of this aspect of the trial court's decision.

remediation costs. Id., § 13B.03, pp. 13B-74 through 13B-102. The defendant relies, however, on several of the reasons cited by the Nichols treatise, upon which some courts and commentators have also relied for excluding contamination evidence in an eminent domain trial.

First, the defendant relies on the proposition that, because "[e]minent domain actions are directed to the property itself and not to the personal capacities or personal characteristics of the owner," only the in rem property, and not the in personam liability, should be valued in eminent domain. Id., § 13B.03 [2] [a], p. 13B-75. Second, and relatedly, the defendant relies on the proposition that "[e]minent domain and environmental law are distinct legal fields with different goals." Id., § 13B.03 [2] [b], p. 13B-76. The defendant argues that admitting such evidence is the functional equivalent of allocating liability for the contamination under the environmental statutes without providing the condemnee with the environmental scheme's attendant defenses and procedural safeguards. See id., pp. 13B-76 through 13B-77 (blurring distinction between two fields compromises procedural and substantive due process and, therefore, goals of those fields should be addressed in respective proceedings). Specifically, the defendant argues that admitting such evidence precludes it from seeking contribution from other responsible parties. Third, the defendant relies on the proposition, as cited in the Nichols treatise, that exclusive federal jurisdiction over environmental cost recovery actions under federal law precludes consideration of federal requirements in a state eminent domain proceeding. Id., § 13B.03 [2] [d] and [f], pp. 13B-82 through 13B-83 and p. 13B-85.

Those propositions, however, put "a premium on the issue of fault, and that is not the issue in an eminent domain proceeding. The condemnor is acquiring property in a given condition, and with a value based on

that condition. How the property got to be that way and who is responsible has nothing to do with that determination. To deny the condemnor the right to put on evidence as to one of the significant determinants of that condition—and hence value—because it may not reflect the owner's degree of responsibility for the condition misses the point of an eminent domain valuation process. If a condemnor sought to acquire a property which had been damaged by the negligence of a third party (e.g., lateral support, landslides), the condemnor would not pay the undamaged value of the property because the condition was not the owner's fault. [R.] McMurry, 'Treatment of Environmental Contamination in Eminent Domain Cases,' A.L.I.-A.B.A. 237, 244 (1995)." (Internal quotation marks omitted.) 7A P. Nichols, supra, p. 13B-75 n.4. Stated another way, permitting the admission of evidence of environmental contamination and remediation costs in an eminent domain proceeding does not mean that in personam liability is being allocated in that proceeding. The purpose of the condemnation hearing is to provide just compensation for the condemnee. That ordinarily entails, according to the principles articulated previously, a determination of what the fair market value of the property was on the date of the taking. When a parcel of property is taken, the condemnor receives a parcel in a certain condition, with a value attached to that parcel in that condition.

The admissibility of evidence of environmental contamination and remediation costs does not impose, as the defendant's argument suggests, a fictional value on the property by virtue of the personal liabilities of the condemnee, specifically, the *potential* liability under the environmental statutes. Instead, it permits the trier to take into account the effect, if any, such contamination and remediation costs had on the property's fair market value on the date of the taking. What the con-

demnation proceeding does not do is adjudge the condemnee as the party responsible for the contamination or its cleanup.

Thus, the valuation trial no more allocates liability under the environmental statutes than it allocates third party liability in a situation where a parcel of property, prior to a taking, is damaged by a third party tortfeasor. The following hypothetical demonstrates this point: Assume a parcel of property with a building that is taken by a municipality. Just prior to the date of the condemnation, there is an airplane crash involving three airplanes, which collide and destroy the building. In a tort action, damages would be allocated among the airlines. Under the defendant's argument, carried through to its logical conclusion, the condemnee should receive the value of the parcel as though the building had not been destroyed, merely because: (1) the building's destruction was not caused by the fault of the condemnee; and (2) there was a separate proceeding, with a different purpose from the eminent domain proceeding, designed to allocate liability. Principles of just compensation do not require such a conclusion.

Fourth, according to the defendant, permitting evidence of environmental contamination in an eminent domain proceeding might result in double liability to the condemnee because the owner might face the same liability in a subsequent environmental action. 7A P. Nichols, supra, § 13B.03 [2] [g], pp. 13B-86 through 13B-87. This argument also assumes too much, namely, that a remediation action is a certainty. Significantly, in the present case, a remediation action has never been brought related to the condemned property.[15] This double liability theory also brushes aside a fundamental principle in the law of eminent domain, namely, that

---

[15] We need not consider the extent to which P.A. 00-89 addresses this contention.

the condemnee should be "put in as good condition pecuniarily by just compensation as he would have been in had the property not been taken." (Internal quotation marks omitted.) *Alemany* v. *Commissioner of Transportation*, supra, 215 Conn. 444. If there is evidence of environmental contamination and the costs to remediate that condition, and if an expert appraiser testifies that such condition and costs had an effect on the fair market value at the time of the taking, to exclude such evidence as a matter of law could result in the condemnee receiving an inflated and fictional value for the property.

Furthermore, we are not persuaded by the decisions of the courts, on which the defendant relies, that have reached a contrary conclusion. In *Aladdin, Inc.* v. *Black Hawk County*, 562 N.W.2d 608, 615 (Iowa 1997), the Supreme Court of Iowa held that, in determining just compensation in an eminent domain proceeding, remediation costs are not admissible. The court reasoned that "[i]f . . . the value of the property condemned is reduced by the estimated cost of cleanup, the landowner will not receive just compensation because the award will be less than full value. In addition, the property owner will still have the same legal liability for cleanup cost as before." Id. The court further stated that "[i]f such cleanup costs are admissible and considered . . . without the procedural safeguards in [the Iowa remediation statute], the procedural due process rights of the property owner are violated." Id. In drawing its conclusion, the court also relied on the potential for "additional delay and expense," and the difficulty in applying the comparable sales methodology. Id., 616.

Similarly, in *Dept. of Transportation* v. *Parr*, 259 Ill. App. 3d 602, 602–603, 633 N.E.2d 19 (1994), the Illinois Appellate Court held that environmental remediation costs at eminent domain proceedings were inadmissible in determining the fair market value of the condemned

property because: "(1) environmental remediation costs, standing alone, have no direct bearing on the valuation of condemned property; and (2) the admission of environmental remediation costs into evidence would violate the due process rights of property owners under the Illinois [remediation statute]." The court distinguished evidence of environmental contamination from evidence of remediation costs, and stated that such costs were independent of the fair market value of the property. Id., 605.

We disagree with those decisions, however, for reasons articulated previously, namely, they put a premium on the issue of fault, which is not the issue in a condemnation proceeding. We also disagree with the proposition that, as the *Parr* decision suggests, the cost of remediating environmental contamination on a parcel of property has *no effect* on, and is therefore independent of, the parcel's fair market value. Furthermore, the court in *Parr* stated that remediation costs are mere evidence of "a condition which may or may not exist." Id. The court also noted that the record was unclear as to whether there was any contamination on the property. Id. In the present case, the presence of contamination was undisputed.

The defendant also contends that permitting the admission of evidence of environmental contamination and remediation costs would give the potential of a windfall to the town, which, according to the defendant, would receive the benefit of the reduced value of the property by virtue of the contamination, and subsequently may receive a so-called double benefit by bringing a remediation action and recovering the costs to remediate the property. We note, however, that "[t]he general rule is that the loss to the owner from the taking, and not its value to the condemnor, is the measure of the damages to be awarded in eminent domain proceedings. *Kimball Laundry Co.* v. *United States*, [338 U.S. 1, 13,

69 S. Ct. 1434, 93 L. Ed. 1765 (1949)]; *Boston Chamber of Commerce* v. *Boston*, 217 U.S. 189, 30 S. Ct. 459, 54 L. Ed. 725 (1910). We would approve a deviation from that principle . . . in a situation where its application produced an unfair result." *Gray Line Bus Co.* v. *Greater Bridgeport Transit District*, 188 Conn. 417, 427–28, 449 A.2d 1036 (1982). We are not convinced that such an unfair result or a windfall to the town has occurred in the present case, where the town, subsequent to the taking, sold the property to Windham Mills for $1 and has not brought a remediation action.[16] Indeed, as the defendant stated at oral argument before this court, the remediation costs related to the complex, which have been incurred subsequent to the taking, have been covered largely by federal and state funds.

Finally, the defendant suggests that evidence of environmental contamination and remediation costs should be inadmissible because the admissibility of such evidence makes the valuation of contaminated properties too difficult, at least in the absence of evidence of sales of comparable contaminated properties—evidence that, according to the defendant, was never presented by the plaintiffs.[17] We conclude, however, that, if the comparable sales method of valuation is employed, the fair market value may be arrived at by (1) evidence of sales of *uncontaminated* comparable property, (2) discounted by some factor, not necessarily dollar-for-dollar, but not necessarily precluding dollar-for-dollar, in the fact-finding discretion of the court, including the

---

[16] Because a remediation action has not been brought against the defendant, there is no occasion to opine on the effect of P.A. 00-89 on the defendant's ability to defend against such a remediation action. Furthermore, there is no evidence in this record to suggest a realistic likelihood of any future remediation action against the defendant.

[17] As a preliminary matter, we note that Amadon testified that one of the comparable sales upon which he based his appraisal was environmentally contaminated.

costs of the remediation.[18] To conclude otherwise could result in a fictional fair market value of the condemned property.

The judgment is reversed and the case is remanded to the trial court for a new trial.

In this opinion KATZ and PALMER, Js., concurred.

---

[18] By this conclusion, contrary to the suggestion of the concurring and dissenting opinion of Judge Flynn, we do not mean to *include* or *preclude* any other factor that a trial court appropriately may deem relevant in its determination of the amount, if any, that is to be awarded as a result of the condemnation of the property. As stated previously, trial courts enjoy substantial discretion in this regard.

Furthermore, Chief Justice McDonald, in his concurring and dissenting opinion, argues, among other things, that "evidence that federal and state funds may be available for reimbursement and that a polluter, American Thread Company, is obligated to remediate the site, should be considered as to the effect, if any, that remediation costs may have on fair market value." Chief Justice McDonald goes on to disagree with our so-called formula for determining fair market value "insofar as it discounts fair market value by remediation costs that may cost a buyer, as in this case, nothing." Chief Justice McDonald also states: "If the condemning authority may so provide itself a cost free cleanup at the time of taking and, at the same time, receive a discount for the very cost of the cleanup, there will be a windfall to the condemning authority."

First, although, as stated by the defendant at oral argument before this court, the costs of remediation have been covered largely by federal and state funds, we do not know, contrary to Chief Justice McDonald's suggestion, the nature of those funds and the extent of the defendant's involvement in procuring them. Indeed, as the trial court stated, Walter Pawelkiewicz, then first selectman of the town, testified at trial that as of December, 1997, more than three years after the taking, the town had not received the $3 million in bonding funds.

Second, the argument that the town would receive a windfall by virtue of the admissibility of remediation costs applies just as well to the defendant if the remediation costs were excluded. Because the defendant has not incurred any remediation costs, and there is no suggestion in this record that a recoupment or remediation action will be brought against it; see footnote 16 of this opinion; the defendant has not suffered any degree of double liability. To the contrary, as stated previously, to exclude the remediation costs as a matter of law could result in the defendant receiving an inflated, fictional property value.

Third, to the extent, if any, that the defendant believes that the town would be receiving a windfall by the admissibility of environmental remediation costs, the defendant may make such a claim in the new trial upon our

MCDONALD, C. J., with whom FLYNN, J., joins, concurring in part and dissenting in part. I agree that the judge trial referee should not have granted the motion in limine as to environmental contamination and that a new trial is required. I also agree, however, with Judge Flynn's concurring and dissenting opinion.

I also respectfully disagree with the majority's suggestion that the identity of the party ultimately responsible for property cleanup costs is not relevant to determine fair market value. Of course, a willing buyer will be concerned and pay less for property that the buyer will be required at his cost to clean up. "The costs of cleanup, along with liability to the public and stigma, often eliminate or significantly reduce a property's value." (Internal quotation marks omitted.) 7A P. Nichols, Eminent Domain (3d Ed. Rev. 2000, P. Rohan & M. Reskin eds.) p. 13B-103 n.2, quoting P. Patchin, "Valuation of Contaminated Properties," 56 Appraisal J. 7 (January 1988). Conversely, should some other responsible party stand ready to bear that cost, be required to pay those costs or actually pay those costs, the remediation costs should not have a direct effect on fair market value. Therefore, I would follow the rationale of *Finkelstein* v. *Dept. of Transportation*, 656 So. 2d 921, 922 (Fla. 1995), in not admitting costs of remediation where there is a program for reimbursement.[1] I would conclude, therefore, that evidence that federal and state funds may be available for reimbursement and that a polluter, American Thread Company, is obligated to

---

remand. Thus, without deciding its propriety, we note the potential for a claim that the defendant is entitled to compensation for reimbursement costs, under the possible exception to the general rule to which we referred in dictum in *Gray Line Bus Co.* v. *Greater Bridgeport Transit District*, supra, 188 Conn. 427–28 ("[w]e would approve a deviation from [the general rule] . . . in a situation where its application produced an unfair result").

[1] I do agree with the majority that factors of stigma, delay and difficulty in a cleanup, and reimbursement, if present in this case, may also affect fair market value.

remediate the site, should be considered as to the effect, if any, that remediation costs may have on fair market value.

I accordingly disagree with the formula for fair market value as stated in the majority opinion insofar as it discounts fair market value by remediation costs that may cost a buyer, as in this case, nothing. This is especially so in the present case, where ATC Partnership (ATC) gave vital support to the application for the reimbursement grant. The trial court found that, since 1992, well before the September, 1994 taking, ATC, Northeast Ct. Economic Alliance, Inc., and the town of Windham had been engaged in a cooperative effort to obtain governmental funding for the rehabilitation and redevelopment of the property pursuant to the Economic Development and Manufacturing Assistance Act of 1990; General Statutes §§ 32-220 through 32-234. This cooperation resulted in the state bonding commission's awarding a $130,000 grant for structural, economic and environmental feasibility analysis and development of the master plan, and, thereafter in 1993, the awarding of an additional $3 million in regional economic development bonding funds for the environmental remediation and rehabilitation of the first 100,000 square feet of space. As counsel for ATC stated at oral argument, the costs of remediation largely have been covered by federal and state funds.

The trial court also found that the principals of ATC had made major contributions to the development plan for those grants. It found that, without their help, the preparation and submission of the plan would not have been possible. In May, 1994, however, negotiations for the voluntary acquisition of the property broke down and this taking followed.

Although the measure of damages, fair market value, is what a willing seller and willing buyer would agree upon, eminent domain involves an involuntary taking

from an owner. Under eminent domain, the condemning authority unilaterally takes the property, unilaterally sets the time of the taking and, therefore, unilaterally establishes the circumstances with respect to environmental cleanup at the time of taking. If the condemning authority may so provide itself a cost free cleanup at the time of taking and, at the same time, receive a discount for the very cost of the cleanup, there will be a windfall to the condemning authority. It is inconceivable that a seller having such a cost free cleanup in place would willingly give such a discount. This result would hardly leave the property owner as well off as if the taking had not occurred, as the law requires. See *United States* v. *564.54 Acres of Land*, 441 U.S. 506, 511–12, 99 S. Ct. 1854, 60 L. Ed. 2d 435 (1979).

FLYNN, J., concurring in part and dissenting in part. I concur with the majority's conclusion that a new trial is required at which evidence of environmental contamination and remediation costs will be admissible. I respectfully dissent with respect to the formula set forth by the majority concerning the valuation of the property, and I join in Chief Justice McDonald's concurring and dissenting opinion.

I

The majority concludes, and I agree, that evidence of environmental contamination and remediation costs are relevant to the valuation of real property acquired by eminent domain and are admissible in a condemnation proceeding to show the effect, if any, that those factors had on the fair market value of the property on the date of the taking. It is unlikely that any willing buyer would ignore environmental damage or fail to consider remediation costs in negotiating a purchase price. Since the offer of proof at trial concerned hearsay evidence about environmental issues that would come in through an appraiser, in my concurrence with this part of the

opinion, I would also hold that such testimony should first be preceded by the actual testimony of the underlying environmental expert. This testimony should, prior to its being offered, be subjected to the standard set forth in *State* v. *Porter*, 241 Conn. 57, 80–81, 698 A.2d 739 (1997), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998).

The fact that an expert opinion relies in part on hearsay evidence does not render the opinion inadmissible, but the hearsay source relied upon must be reliable and the expert must have sufficient experience to evaluate the information. *Vigliotti* v. *Campano*, 104 Conn. 464, 465, 133 A. 579 (1926). Such reliance by appraisers makes sense with respect to reliance on multiple listings and other similar trustworthy sales data. It does not make sense with respect to scientific environmental data, related regulatory issues, costs necessary to remediate and other aspects of environmental contamination unless the underlying expert's testimony has been admitted. See *State* v. *Porter*, supra, 241 Conn. 80–81.

II

I respectfully dissent from the majority's valuation formula for the trial court to follow. The majority sets forth a formula that first values the contaminated property by establishing a fair market value, and then deducts from that value the loss caused by any environmental contamination of that property. Specifically, the majority holds that "the fair market value may be arrived at by (1) evidence of sales of uncontaminated comparable property, (2) discounted by some factor, not necessarily dollar-for-dollar, but not necessarily precluding dollar-for-dollar, in the fact-finding discretion of the court, including the costs of the remediation. To conclude otherwise could result in a fictional fair market value of the condemned property."

This formula focuses solely on the value of the property taken, but neglects to permit the trial judge to award damages for the total loss to the property owner resulting from the taking, including any consequential damages. Furthermore, it does not adequately address a possible windfall reaped by the condemnor or its assigns at the condemnee's expense.

At the outset, it is worth reviewing that both the fifth amendment to the United States constitution, as applied to the states through the due process clause of the fourteenth amendment, and article first, § 11, of our state constitution, provide that private property shall not be taken for public use without just compensation. *Santini* v. *Connecticut Hazardous Waste Management Service*, 251 Conn. 121, 136, 739 A.2d 680 (1999), cert. denied, 530 U.S. 1225, 120 S. Ct. 2238, 147 L. Ed. 2d 266 (2000). The measure of damages to be awarded to the condemnee in an eminent domain proceeding is the loss to the owner from the taking, and not its value to the condemnor. *Gray Line Bus Co.* v. *Greater Bridgeport Transit District*, 188 Conn. 417, 427, 449 A.2d 1036 (1982).

This court has recognized in the past that one valuation formula cannot fit all cases. "[T]he question of what is just compensation is an equitable one rather than a strictly legal or technical one. The paramount law intends that the condemnee shall be put in as good condition pecuniarily by just compensation as he would have been in had the property not been taken." (Internal quotation marks omitted.) *Alemany* v. *Commissioner of Transportation*, 215 Conn. 437, 444, 576 A.2d 503 (1990).

Fifth amendment considerations have caused courts to depart from the strict fair market value formula of measuring only the property condemned. In fact, in severance cases, this court has not hesitated to depart

from the focus on the fair market value of the land taken. The court has looked to the entire loss caused by the taking. A severance occurs when the condemning authority takes only part of the whole of the condemnee's land. In such cases, this court has considered not only the value of the property taken, but also any resulting diminution in the value of the remaining property not taken. *D'Addario* v. *Commissioner of Transportation*, 180 Conn. 355, 363, 429 A.2d 890 (1980); *Tandet* v. *Urban Redevelopment Commission*, 179 Conn. 293, 298, 426 A.2d 280 (1979). The rationale behind looking not just to the value of the part of the condemnee's property taken, but also to consequential damages caused to the remaining property not taken, is that it is unjust to expect the condemnee to bear damages for which the public should stand.

Another instance when courts will fashion and apply other standards is "[w]hen market value has been too difficult to find, or when its application would result in *manifest injustice* to [the] owner or public . . . ." (Emphasis added; internal quotation marks omitted.) *United States* v. *564.54 Acres of Land*, 441 U.S. 506, 512, 99 S. Ct. 1854, 60 L. Ed. 2d 435 (1979).

No one method of valuation, however, is controlling in the trier's determination of just compensation. "The trier may select the one most appropriate to the case before him in arriving at his own conclusion as to the value of a land interest." *Laurel, Inc.* v. *Commissioner of Transportation*, 180 Conn. 11, 37, 428 A.2d 789 (1980). "[A] trial court may seek aid in the testimony of experts, but must ultimately make its own independent determination of fair compensation . . . on the basis of all the circumstances bearing upon value." (Citation omitted; internal quotation marks omitted.) *French* v. *Clinton*, 215 Conn. 197, 202–203, 575 A.2d 686 (1990). "Our cases have reaffirmed the principle that, because each parcel of real property is in some ways unique,

trial courts must be afforded substantial discretion in choosing the most appropriate method of determining the value of a taken property." (Internal quotation marks omitted.) *Commissioner of Transportation* v. *Towpath Associates*, 255 Conn. 529, 541, 767 A.2d 1169 (2001).

With these principles in mind, I first take issue with the majority's formula for determining the condemnee's damages by focusing on comparative sales data from sales of similar uncontaminated property diminished by some factor for the cost of remediation of the contaminated property taken from the condemnee. This formula can result in manifest injustice to the landowner in this case because it is not compensated for other consequential damages, beyond the fair market value of the land, which nonetheless arise from the taking. Furthermore, the formula takes from the trial judge hearing the evidence in the case the necessary power he or she always has had to evaluate the whole loss arising from the condemnation and to fashion remedial equitable compensation.

Second, the majority formula does not permit the trial judge to compensate the condemnee adequately if the evidence proves the windfall argument made by the defendant. In *Gray Line Bus Co.* v. *Greater Bridgeport Transit District*, supra, 188 Conn. 429–30, this court pronounced the windfall exception to the general rule by stating: "Although benefit to the taker may not be the measure of damages in a condemnation proceeding, it is not wholly irrelevant in deciding whether the taking of a particular form of property merits some award. The basic principle that private property may not be taken without just compensation is offended where a public authority is permitted to receive *a windfall of substantial value* without some recognition of the interest of the owners in the form of a reasonable award." (Emphasis added.)

The Court of Appeals of New York confronted a difficult valuation problem resulting from the taking of the Hudson Tubes, a construction linking Manhattan with New Jersey, which would not have a ready market value and which actually would cost money to fill in and close down and thus, have a negative value. *In the Matter of Port Authority Trans-Hudson Corp.* v. *Hudson Rapid Tubes Corp.*, 20 N.Y.2d 457, 464–66, 231 N.E.2d 734, 285 N.Y.S.2d 24 (1967), cert. denied, 390 U.S. 1002, 88 S. Ct. 1244, 20 L. Ed. 2d 103 (1968). Because the condemning agency would acquire something that would have cost $400 million to replace and would still use after the condemnation, the court rejected a conventional sales data approach to valuation. Id., 467. The court deviated from the fair market value approach because this was a situation where its application would have produced an unfair result. Id., 468.

Relying on portions of the oral arguments before this court, the majority holds that "[w]e are not convinced that such an unfair result or a windfall to the town has occurred in the present case, where the town, subsequent to the taking, sold the property to Windham Mills for $1 and has not brought a remediation action," and further holds that whatever remediation costs that were incurred after the taking have been covered largely by federal and state funds. Reliance on that sparse record should not circumscribe the trial judge who must hear this case on retrial. The actual evidence may in fact show that the amount by which the condemning authority wishes to diminish the value of the condemned property due to environmental contamination and remediation costs has never been spent, need not have been spent, will not need to be spent, or may be far less than appraisal testimony might otherwise indicate. If the condemnation award is reduced substantially due to remediation, which never occurs or which does occur

but costs far less than the reduction, a windfall may result.

I would alter the majority's formula to permit the trial judge to fashion a more equitable award. First, just compensation should include compensation to the condemnee for any right lost by the taking to recover remediation costs from prior owners pursuant to the Comprehensive Environmental Response, Compensation and Liability Act; 42 U.S.C. § 9601 et seq.; because no remediation costs had been incurred by the condemnee prior to the taking as required by that federal law.[1] Otherwise, the condemnation would result in a taking that would leave the condemnee worse off after the taking than before the taking because its financial compensation was reduced by an imputed cost of remediation that the very condemnation action robbed it of any right to recover.

Second, the trial judge should be free to provide equitably in his or her award for any increased exposure to third party claims that has been imposed on the condemnee as a result of the taking. The condemnee would suffer a diminution of the value of its property by the introduction of evidence of environmental contamination, damage and remediation costs. The condemnee would still remain potentially liable, however, for those same costs as a prior owner to any subsequent

---

[1] It is important to note that a right of cost recovery does not arise under 42 U.S.C. § 9607 until a party has incurred *some* remediation costs. See 7A P. Nichols, Eminent Domain (3d Ed. Rev. 2000, P. Rohan & M. Reskin eds.) § 13B.04 [1], p. 13B-104; see also *United States* v. *Taylor*, 909 F. Sup. 355, 363 (D.N.C. 1995) (stating that "a party must, in some degree, actually conduct the cleanup"); *Jones* v. *Inmont Corp.*, 584 F. Sup. 1425, 1430 (D. Ohio 1984) (holding that "some costs must be incurred prior to the filing of a suit under the liability provision of section 9607, but cleanup need not be completed prior to the filing of such a suit").

In the present case, the condemnee did not conduct *any* remediation prior to the taking and, therefore, may have lost the right to seek remediation costs pursuant to 42 U.S.C. § 9607.

owners, such as the nonprofit corporation to which the city conveyed its interest. Essentially, before the taking, the condemnee was not liable to any subsequent title-holder who became the sole owner of the contaminated property. For example, there was no liability to the nonprofit corporation, which had obtained title from the condemnor. After the taking, however, there is a risk of double liability for contamination because the condemnee, after diminution of his award for environmental damage, may face liability for the same damage in a subsequent federal proceeding by a subsequent owner, which liability is joint and several under the Comprehensive Environmental Response, Compensation and Liability Act.

Third, the record is silent on whether the federal Environmental Protection Agency or the state department of environmental protection had made any pollution abatement orders prior to the taking. The trial judge should be left free upon retrial to fashion an equitable award. If there have been no such orders, but there is to be some diminution in the compensation paid to the condemnee because of potential liability relating to future agency orders, then the trial judge should be free to require the condemning authority to place the diminution sum due to environmental contamination and remediation costs in trust to cover future remediation costs. If the sums necessary to remediate in order to satisfy actual agency orders exceed or equal the amount reduced from the fair market value of that award, the corpus should become the sole property of the condemnor. If the amount of award diminution due to remediation cost is never paid because neither environmental agency ever issues an order, or because orders are issued but the cost of their compliance is far less than the sum by which the condemnation award is diminished, then the unused balance should go to the condemnee. The trial judge should set the terms

and duration of the trust imposed, as just compensation may require.

In sum, any formula for arriving at the condemnee's damages should be broad enough to permit the trial judge to award all the just damages to the condemnee arising from the taking. Because the damages formula set out by the majority does not, I respectfully dissent from that part of the opinion.